UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:16CR00058 AGF (ACL) ) ) |
| JAMES CLAY WALLER, II, | ) ) |
| Defendant. | ) ) |

**MOTION TO DISMISS INDICTMENT ON GROUNDS OF DOUBLE JEOPARDY AND VIOLATION OF DUE PROCESS, FAILURE TO STATE AN OFFENSE AGAINST THE UNITED STATES AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

COMES NOW Defendant, JAMES CLAY WALLER, II, by and through undersigned counsel, and for his Motion to Dismiss Indictment on Grounds of Double Jeopardy and Violation of Due Process and Incorporated Memorandum of Law in Support, hereby states to the Court the following:

**Introduction**

On April 23, 2012, Defendant James Clay Waller, II, ("Waller") was charged by criminal complaint in the Cape Girardeau Circuit Court with Murder in the Second Degree, a Class A Felony in the State of Missouri pursuant to Section 565.021 RSMo. This State-level matter was memorialized by Cause No. 12CG-00686-01. In that case, Waller was charged with causing the death of his spouse, Jacque Sue Waller. On June 6, 2013, Waller entered a plea of guilty to one count of Second Degree Murder and was sentenced by agreement to twenty years in the Missouri Department of Corrections. Said agreement followed Waller's apparent decision to cooperate with federal and local authorities for purposes of locating the body of Jacque Sue Waller. Waller argues that his decision to enter into this agreement was based on, *inter alia*, the following: (1) that the

matter of his wife's death would be closed; meaning that as a result of his cooperation, there would be no charges other than those filed in the Circuit Court of Cape Girardeau; and (2) that he was never advised of the potential admissibility of this guilty plea in a subsequent federal proceeding because there simply wouldn't be a federal case.[1]  Accordingly, and following a series of conversations with federal investigators over several days, Waller admitted to causing the death of Jacque Sue Waller and subsequently provided a location as to where her body would be located. Jacque Sue Waller's body was ultimately located in a remote area along the Mississippi River across from the greater Cape Girardeau area; technically in Illinois.[2]  Prior to Waller's express agreement to cooperate with authorities in their investigation of Jacque Sue Waller's death, the investigation had fundamentally stalled due to an ostensible lack of evidence- a manquait en fait.

Approximately four years later, on May 19, 2016, Waller was again charged with a homicide offense; this time by federal indictment wherein the Government set forth one count of traveling in interstate commerce with the intent to kill Jacque Sue Waller, and as a result of said travel, committed the murder of Jacque Sue Waller, a crime of violence under 18 U.S.C. §2261(a)(1)- Interstate Domestic Violence.  A forfeiture allegation was also filed by the Government where it now seeks proceeds from certain media related to the crime in issue, and more specifically, all proceeds of a book allegedly derivative of a "manuscript authored" by Waller entitled "If You Take My Kids, I'll Kill You!; True Confessions of Missouri's Most Notorious Wife Killers" *See* Indictment, on file with this Court as Doc. 1.  Waller believes the impetus for the instant charge of murder was based solely on publication of the aforementioned book.

---

[1] *See e.g., United States v. Holmes*, 794 F.2d 345, 349 (8th Cir. 1986)(Referring to the general admissibility of a guilty plea in a collateral federal case).  Waller states that prior State counsel never advised as to the admissibility of said plea.

[2] On June 3-4, 2013, Waller agreed to be interviewed in a formal setting by federal agents, specifically SA Brian Ritter. Waller admitted to causing the death of Jacque Sue Waller during this interview.  Two days later, on June 6, 2013, Waller entered a plea and was sentenced to the 20-year term of imprisonment referenced above.

Waller argues that the present federal indictment is in violation of his constitutional right to due process in multiple contexts, and also in violation of the Double Jeopardy Clause, in that said indictment is frivolous or otherwise vindictive, as it is based on nothing more than punishing Waller for the publication of a book alleged to have outlined the murder of Jacque Sue Waller. In this instance, the delayed federal prosecution, or dual prosecution, of Waller serves no legitimate interest in enforcing federal law as it is factually the same as the State-level matter, and as such is an unnecessary and inefficient use of federal resources.

## Legal Argument

### I. The Double Jeopardy Clause and the Doctrine of Dual Sovereignty

The subsequent federal prosecution of Waller for essentially the same offense as the State proceeding violates the Double Jeopardy Clause of the United States Constitution via the *Bartkus* exception to the Dual Sovereignty Doctrine. The Double Jeopardy Clause provides that no party "be subject for the same offense to be twice put in jeopardy of life or limb…" *U.S. Const. amend V*. More simply stated, the 5th Amendment provides an express protection "from repeated prosecutions for the same offense." *See Oregon v. Kennedy,* 456 U.S. 667, 671 (1982). Nonetheless, under the doctrine of dual sovereignty, it is well-settled that double jeopardy does not preclude federal prosecution of a defendant who had previously been prosecuted for the same act in a state proceeding. *See United States v. Basile*, 109 F.3d 1304, 1307 (8th Cir. 1997)(citing *Abbate v. United States*, 359 U.S. 187, 194 (1959)).

An exception to the dual sovereignty doctrine has been created by the Supreme Court where "the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution." *See Bartkus v. Illinois,* 359 U.S. 121, 124 (1959); *See also United States v. Garner*, 32 F.3d 1305, 1310 (8th Cir. 1994)(recognizing the *Bartkus* exception in the

4

8th Circuit). The core of the *Bartkus* inquiry revolves around whether a "state prosecution was de facto a second federal prosecution." *See United States v. Williams*, 104 F.3d 213, 216 (8th Cir. 1997). It also follows that the converse (federal prosecution following state prosecution) is equally subject to the *Bartkus* exception. *See e.g. United States v. Leathers*, 364 F.3d 955, 960 (8th Cir. 1994)(noting that while the 8th Circuit has never explicitly held that the *Barkus* exception applies to subsequent federal prosecution, it has never specifically precluded such judicial consideration). A prerequisite for this *Bartkus* exception includes a showing of unlawful collusion among the officials involved; that one necessarily affected the other in a manner designed to deprive a defendant of his or her basic criminal rights. *See United States v. Talley*, 16 F.3d 972, 974 (8th Cir. 1994)(referring to *Bartkus*-centric jurisprudence that recognizes mere cooperation among state and federal officials is <u>not</u> sufficient to create an exception to the dual sovereignty doctrine). Examples of such collusion, or impropriety, also include the <u>frivolous</u> or unnecessary nature of the prosecution, and/or manipulation to where officials in the subsequent prosecution retained little or no independent volition. *Id.* at 974; *See also, United States v. 38 Whaler's Cove Drive*, 924 F.2d 29, 38 (2nd Cir. 1992).

In the case at bar, Waller does not pretend that the prosecutors involved did not retain their independence. Nor does Waller argue that routine cooperation between them was tantamount to some prosecutorial impropriety in violation of his constitutional rights. However, Waller does suggest that there did exist some inappropriate collusion to first, induce Waller into cooperating, and then to forge a pathway for federal prosecution following the discovery of the book. Waller argues that the frivolous nature of the federal case falls within the exception to the dual sovereignty doctrine carved out in *Bartkus* as it is nothing more than an unnecessary, second State prosecution, and that the apparent collusion by the authorities post-plea and despite representations to the contrary thereby created that impropriety; all for an illegitimate purpose-

5

the book.

Waller requests this Court examine the factual basis of the federal case, including extensive federal intervention in the State proceeding, including the use of federal resources as a means to induce cooperation, the subsequent actions of certain federal actors following discovery of Waller's book, and the delayed prosecution. Waller argues that these actions warrant a finding that this matter was in violation of the Double Jeopardy Clause, and as such, his case should be dismissed.

### Scholarly & Judicial Criticism of the Dual Sovereignty Doctrine

As a collateral attack on the present indictment, and in further support of the present motion, Waller urges this Court to consider secondary sources of information, including scholarly and judicial criticism of the development and implementation of our modern notion of dual sovereignty. Dual sovereignty is patently unfair and has long been the subject of both scholarly and judicial criticism for many years. *See e.g.,* Adam J. Adler, Note, *Dual Sovereignty, Due Process, and Duplicative Punishment: A New Solution to an Old Problem*, 124 Yale L.J. 448 (2014). Waller doesn't pretend to reinvent the wheel as it relates to this criticism; only to relay it for this Court's review. The paradigm for which the dual sovereignty doctrine now exists is infirm, thus needing judicial redress to correct an unhealthy approach to what is essentially a legal means of avoiding the limitations of the Double Jeopardy Clause.

i. Scholarly Criticism

Scholars have addressed the issues revolving around what has been a marked evolution in the application of the dual sovereignty doctrine; more specifically, where this concept has been stretched and molded to encompass almost every scenario imaginable when state and federal actors set their collective resources in motion to prosecute an individual within their respective fora. This is the concern.

6

Some scholars have argued for complete abolition of the dual sovereignty doctrine: Daniel A. Braun, *Praying to False Sovereigns: The Rule Permitting Successive Prosecutions in the Age of Cooperative Federalism*, 20 Am. J. Crim. L. 1, 10 (1992):

> "The changed relationship between the state and the federal governments in the age of cooperative federalism has changed this country's criminal law and the process through which it is enforced. Officials and agencies that formerly acted as representatives of distinct and independent governments now occupy a "united front" against criminal activity. The Fifth Amendment guarantee that no person shall be "subject for the same offense to be twice put in jeopardy" is a provision "made in a constitution intended to endure for ages to come." As Chief Justice Marshall recognized, such provisions must at times be adapted in order to survive. The country has entered a new age in the way it deals with crime. If the protection from double jeopardy does not respond to the challenges that have arisen in this new age, it will lose some of its meaning.
>
> The argument set out [herein] blurs a line between the state and federal governments. However, in the area of criminal law, the clear line that formerly demarcated the distinct powers and responsibilities of those governments has already been smudged beyond recognition. The dual sovereignty doctrine beautifully restores the image of independent sovereign governments. In order to accomplish that result, however, the proponents of the doctrine have had no choice but to craft and cling to a fiction that now utterly fails to resemble reality. As a result, the law they have created deserves the Constitution and imparts a guarded cynicism towards any claim that the guarantees in that document reflect an aspiration to justice."

Id. at 76 (citations omitted); Erin M. Cranman, Comment, *The Dual Sovereignty Exception to Double Jeopardy: A Champion of Justice or a Violation of a Fundamental Right?,* 14 Emory Int'l L. Rev. 1641, 1671-74 (2000); Michael A. Dawson, Note, *Popular Sovereignty, Double Jeopardy, and the Dual Sovereignty Doctrine*, 102 Yale L.J. 281, 302 (1992); and Kevin J. Hellmann, Note, *The Fallacy of Dueling Sovereignties: Why the Supreme Court Refuses to Eliminate the Dual Sovereignty Doctrine*, 2 J.L. & Pol'y 149, 153-55 (1994).

Following suit, but with a plan of action, other scholars have offered a replacement for the dual sovereignty doctrine with an approach that would considerably limit successive or parallel prosecutions: Ophelia S. Camina, Note, *Selective Preemption: A Preferential Solution to the Bartkus-Abbate*

7

*Rule in Successive Federal-State Prosecutions*, 57 Notre Dame Law. 340, 362-63 (1981) (proposing a system that would avoid successive state-federal prosecutions by allowing the federal government to intervene and selectively preempt a state prosecution); and Dax Eric Lopez, Note, *Not Twice for the Same: How the Dual Sovereignty Doctrine Is Used to Circumvent Non Bis in Idem*, 33 Vand. J. Transnat'l L. 1263, 1300-02 (2000) (arguing that the dual sovereignty doctrine should be replaced with joint trials).

Finally, scholars have also provided for a substantial modification of the dual sovereignty doctrine: Akhil Reed Amar & Jonathan L. Marcus, *Double Jeopardy Law After Rodney King*, 95 Colum. L. Rev. 1, 2-3 (1995) (proposing to abolish the dual sovereignty doctrine except for offenses "committed by state officials and implicating the federal government's unique role under Section 5 of the Fourteenth Amendment"); Cranman, supra note 4, at 1677-78 (allowing a second prosecution only if the first prosecution was incompetent); James E. King, Note, The *Problem of Double Jeopardy in Successive Federal-State Prosecutions: A Fifth Amendment Solution*, 31 Stan. L. Rev. 477, 496-97 (1979) (proposing a rule that would require governments to initiate a joint proceeding whenever their interests in obtaining a conviction are sufficiently similar); and Robert Matz, Note, *Dual Sovereignty and the Double Jeopardy Clause: If at First You Don't Convict, Try, Try Again*, 24 Fordham Urb. L.J. 53, 354-55 (1997) (arguing that successive prosecutions should not be allowed if the first prosecution results in an acquittal).

  ii. <u>Judicial Criticism</u>

Notwithstanding the Supreme Court's elucidation of the concept of dual sovereignty in *Bartkus v. Illinois*, 359 U.S. 121 (1959), and *Abbate v. United States*, 359 U.S. 187 (1959), the Court has not been thoroughly immunized from judicial criticism.  Accordingly, dissenting opinions are worth noting.  In each of the above-stated cases, Justice Black, not exactly a lightweight in terms of

8

judicial intellect, dissented as he was not entirely convinced "that a State and the Nation can be considered two wholly separate sovereignties for the purpose of allowing them to do together what, generally, neither of them can do separately." *Abbate*, 359 U.S. at 203.  Justice Black was particularly concerned that the dual sovereignty doctrine was not imported from English law's double jeopardy jurisprudence, but instead was manufactured by the Court in its earliest case on the subject, *Fox and United States v. Marigold*, 50 U.S. (9 How.) 560 (1850) to accommodate coexisting sovereigns in the American federal system.  Justice Black was also concerned that dual sovereignty supplanted the right to avoid successive prosecutions, specifically writing as follows:

> "The Court apparently takes the position that a second trial for the same act is somehow less offensive if one of the trials is conducted by the Federal Government and the other by a State. Looked at from the standpoint of the individual who is being prosecuted, … it hurts no less for two "Sovereigns" to inflict it than for one."

*Bartkus*, 359 U.S. at 155.  Observing that "the Court's reliance on federalism amounts to no more than the notion that, somehow, one act becomes two because two jurisdictions are involved," Justice Black implored that it be "discarded as a dangerous fiction." *Id.* at 158. He dismissed the majority's concern that "failure to allow double prosecutions would seriously impair law enforcement in both State and Nation" as premised on the "unwarranted assumption that State and Nation will seek to subvert each other's laws." *Id.* at 156. Drawing on principles of preemption, Justice Black provided:

> "[t]he Federal Government is given power to act in limited areas only, but in matters properly within its scope it is supreme. It can retain exclusive control of such matters, or grant the States concurrent power on its own terms. If the States were to subvert federal laws in these areas by imposing inadequate penalties, Congress would have full power to protect the national interest, either by defining the crime to be punished and establishing minimum penalties applicable in both state and federal courts, or by excluding the States altogether."

*Id.* at 156-157.  ("[M]ost civilized nations do not and have not needed the power to try people a

9

second time to protect themselves even when dealing with foreign lands.").

Some in the lower courts have parroted Justice Black's concerns. For example, in an opinion by Judge Adams, the 3rd Circuit encouraged reconsideration of the dual sovereignty "construct," that the Court previously "deemed necessary in order to protect arguably separate governmental interests in law enforcement." *United States v. Grimes*, 641 F.2d 96, 101 (3d Cir. 1981). Judge Adams argued that *Bartkus* "appears open to question from two perspectives one of evolving constitutional principle; one of historical precedent." *Id.* at 101. Suggesting that the Court consider a "retreat from a rigid doctrine of dual sovereignty," *Id.* at 102, Judge Adams opined that "an important predicate of the *Bartkus* opinion that the Fifth Amendment Double Jeopardy provision does not bind the states has been undercut by subsequent constitutional developments." *Id.* at 101.

Judge Adams also noted that *Bartkus* relied on case law pre-dating the Fourteenth Amendment, and long before "the present reality of a greatly expanded federal criminal law." *Id.* There, he explained that most of the old cases, including *Fox*, "did not actually involve multiple prosecutions but simply raised the question whether both state and federal governments could make the same conduct a crime." *Id.* at 102-03. Judge Adams found problematic the *Bartkus* Court's reliance on *Moore v. Illinois*, a case that "concerned the validity of state fugitive slave legislation … a politically freighted issue," leading him to conclude that "the Court's statement that a citizen owes allegiance to two sovereigns and may be liable to punishment for an infraction of the laws of either should be read with considerable caution." *Id.* Simply stated, jurisprudence in that regard was due for a refresher course as historical circumstances have changed the dynamic of governance. According to Judge Adams, "developments in the application of the Bill of Rights to the states, consequent alterations in the system of dual sovereignty, and the historic idiosyncrasies

10

of various of the precedents upon which *Bartkus* relie[d] may deprive the opinion of much of its force." *Id.* at 104; *See also United States v. Frumento*, 563 F.2d 1083, 1092 (3d Cir. 1977) (Aldisert, J., dissenting) ("I am of the view that *Abbate* was wrongly decided in 1959. The majority opinion never came to grips with Justice Black's analysis in dissent, joined by Chief Justice Warren and Justice Douglas, and no developing doctrine in the intervening eighteen years has persuaded me to alter my original views.").

The concurrence in *United States v. All Assets of G.P.S. Auto. Corp.,* 66 F.3d 483 (2d Cir. 1995), is also worthy of discussion. There, Judge Calabresi fundamentally dismantled what he perceived as an antiquated view of dual sovereignty, which he coined, Rethinking the Dual Sovereignty Doctrine. *Id.* at 496-497 and n.13. Specifically noted in this dissection of the doctrine, Judge Calabresi discussed its original purpose and that it emerged "during prohibition when there was considerable fear of state attempts to nullify federal liquor laws, as well as the doctrine's rebirth just at the time when state attempts to nullify federal desegregation laws and orders were at their height." *Id.* While admitting the critical interest in a "sovereign's ability to enforce its own laws as it wishes," Judge Calabresi nonetheless added that "it is hard to justify limiting the reach of the Bill of Rights, adopted as it was to protect individual rights and liberties against governmental encroachment, on no stronger grounds than the relative cumbersomeness of plausible alternative measures that would protect the interests of the sovereigns involved." *Id.* at 498. He found it "difficult to accept generalized statements of sovereign interests as justifying the Clause's inapplicability to successive prosecutions by different governments." *Id.*

Judge Calabresi also expounded on the evolution that has occurred in the relationship between the states and federal government since *Bartkus* and *Abbate*. He explained that "…changes that have made what was then perhaps acceptable, or at least tolerable, far more

11

dangerous today." *Id.* at 498.  He then added his concern that since these cases (1959), "the scope of federal criminal law has expanded enormously.  And the number of crimes for which a defendant may be made subject to both a state and a federal prosecution has become very large." *Id.*  Finally, Judge Calabresi added that, "[t]he degree of cooperation between state and federal officials in criminal law enforcement has … reached unparalleled levels in the last few years," which "should cause one to wonder whether it makes much sense to maintain the fiction that federal and state governments are so separate in their interests that the dual sovereignty doctrine is universally needed to protect one from the other." *Id.* at 499.   In essence, the initial thought process surrounding the inception of the dual sovereign doctrine has become obsolete and unnecessary.

This notion of an out-of-touch dual sovereign doctrine is evidenced in the reality in which the states and the federal government now operate in prosecuting criminal behavior.  Joint efforts between state and local authorities have increased exponentially over the years, fueled by Congressional expansion of federal law into state-enforcement areas.  Even the American Bar Association has concluded that "[a] complex layer is being added to the overall criminal justice scheme, dramatically superimposing federal crimes on essentially localized conduct already criminalized by the states." James A. Strazzella, *Task Force on Federalization of Criminal Law*, 1998 A.B.A. Crim. Justice Sec. Rep. 18.

Other examples are legislative.  Congress has adopted the Comprehensive Crime Control Act of 1984, federalizing many offenses that were traditionally enforced by state officials and expanding the roles of joint- jurisdictional task forces.  *See* 21 U.S.C. § 873 (authorizing the Attorney General to transfer forfeited property to any federal, state, or local agency that participated directly in the seizure or forfeiture of the property). And courts have approved such

12

collaboration. *See United States v. Davis*, 906 F.2d 829, 831 (2d Cir. 1990) ("[C]ooperation between federal and local agencies has become increasingly important and increasingly commonplace."); Daniel A. Braun, *Praying to False Sovereigns: The Rule Permitting Successive Prosecutions in the Age of Cooperative Federalism*, 20 Am. J. Crim. L. 1, 77, n.351 (1992).  At present, this expanded cooperation is still the case.  Here, the FBI worked specifically with local authorities in an effort to urge Waller to cooperate with an otherwise stalled criminal investigation.  Federal resources were intertwined with State-level actions in order to achieve a State-level conviction.  It follows that the present federal indictment is something less than the federal authorities' interest in ensuring that a federal crime doesn't go unpunished.  The factual background of this case contradicts this.  Waller believes that sufficient ratiocination of the concept of dual sovereignty supports his motion to dismiss.

## II. Vindictive Prosecution- Another Violation of Due Process

Waller next argues that the present federal prosecution is in violation of his due-process rights as protected under the Fifth Amendment for being vindictive and frivolous.  Specifically, Waller states that the federal case was brought solely to punish him for the publication of the book, "If You Take My Kids, I'll Kill You!; True Confessions of Missouri's Most Notorious Wife Killers".  As filed, the federal prosecution simply seems unnecessary, and therefore absent a legitimate federal interest in ensuring that a person, who is alleged to have committed a federal crime, is punished for that crime.  *See United States v. Talley, supra,* at 974.  Instead, the federal indictment of Waller, three years after his plea to State charges, suggests federal authorities had a singular motivation- personal.

Prosecution for no other purpose than to punish an individual for exercising a valid legal right violates due process.  *See Blackledge v. Perry,* 417 U.S. 21, 25-26 (1974); *See also, United States v.*

13

*Leathers*, *supra,* at 955.  More specifically, although prosecutors enjoy broad discretion in their charging decisions, such decisions may not be based out of vindictiveness or in retaliation for a person's exercise of a legal right.  *See United States v. Kriens*, 270 F.3d. 597, 602 (2001)(referring *United States v. Beede*, 974 F.2d 948, 952 (8th Cir. 1992)).  The burden rests on the defendant to show that the prosecution was brought as a means to punish the defendant for exercising a legal right or for some other arbitrary reason.  *Id.* at 602.  Such proof may be shown via direct and/or circumstantial evidence.  *See Beede, supra* at 951.  Although *Blackledge* and its progeny in this Circuit routinely address prosecutorial vindictiveness as related to enhanced charges following the exercise of constitutional rights at or following trial, they also do not preclude consideration of other examples of vindictiveness, such as the case at bar.  So vindictiveness as it relates to the exercise of the First Amendment is not specifically precluded.

  The case of James Clay Waller, II, is largely one of first impression.  Nevertheless, the facts and circumstances underlying the federal authorities' decision to prosecute support a finding of vindictiveness, and therefore, a violation of Waller's due process rights.  Before delving into that discussion, it is important to recognize the almost unfettered authority a federal prosecutor has in making his or her own charging decisions.  To say otherwise, would be in derogation of reality.  Examples of this discretion include choice of forum, consideration of penalties available in each forum, changes in charges where a defendant refuses to plead guilty, and the continuation of an investigation.  *See e.g. United States v. Turpin,* 920 F.2d. 1377, 1390; *See also, United States v. Punelli,* 892 F.2d 1364, 1371 (8th Cir. 1990).  None have been found in this Circuit to have warranted a finding of vindictiveness.  But in the present case, we have a markedly divergent factual scenario from those this Circuit has traditionally addressed.

14

Here, we have a notable delay in federal prosecution- approximately four years.  During that period, there was no developing investigation such that the additional time was a necessary ingredient in the Government's overall recipe for federal prosecution success.  *See e.g., Turpin, supra.*  To the contrary, the present case rests entirely on the exact same set of facts derived from Waller's cooperation in June of 2013; cooperation that allowed federal and local authorities to resolve this case with a plea in State court.

That leaves the book in question.  Although arguably in bad taste (perhaps an understatement), the book apparently generated by Waller wasn't actually generated by Waller, but rather via an author from the Baton Rouge, Louisiana area.  Regardless, the book was not illegal.  In fact, and assuming *arguendo* that Waller did indeed pen a manuscript or memoir from which this book was birthed, his ability to do so was, in essence, a constitutionally-protected right; his First Amendment right to free speech.  Waller could, and still can, say anything he chooses regarding the death of Jacque Sue Waller, and cannot be prosecuted for it because it is deemed inappropriate or disturbing.  There are several instances where persons convicted of crimes have had published memoirs of the facts surrounding those crimes.

This argument is not without support.  The discovery provided by the Government to date necessarily reveals a questionable motivation behind this federal prosecution, to include multiple reports by the FBI regarding efforts to uncover the background of this Waller book, including interviews with witnesses and use of digital technology.  In sum, Waller believes that the book's discovery infuriated federal agents to a point where they demanded federal prosecution where there was no prior indication that one was to be brought, and to which Waller contends he was told was not going to happen in light of his cooperation.

15

### III.  Selective Prosecution

Lastly, Waller argues that the decision to prosecute in this case was selective, and therefore, evidences another violation of his due process rights.  *See United States v. Parnham,* 16 F.3d 844, 846 (8th Cir. 1994).  In *Parnham*, this Circuit reaffirmed the well-established two-prong test for prevailing on a claim of selective prosecution: (1) that a defendant has been singled out for prosecution where other similarly situated defendants engaged in similar conduct have not been prosecuted; and (2) the decision to prosecute (singling out of the defendant) was based on some "…impermissible motive such as race, religion, or the exercise of constitutional rights." *Id.* at 846. (emphasis added); *See also, United States v. Matter,* 818 F.2d. 653 (8th Cir. 1987)(referring to the standard set forth in *Wayte v. United States*, 105 S.Ct. 1524 (1985)).  Such "constitutional rights", of course, includes the exercise of the First Amendment right to free speech.  *See United States v. Catlett*, 584 F.2d 864, 866 (8th Cir. 1978).

At present, we are again presented with an unorthodox issue for which this Court must consider whether Waller's due process rights were, in fact, violated.  While Waller recognizes the unique, and likely, never-before-addressed legal situation, it is no less deserving of careful judicial consideration.  The evolution of our system of justice demands such scrutiny.  Accordingly, Waller submits that the Government has not previously filed federal charges against an individual convicted first at a state level for alleged publication of a murder tell-all.  That alone, Waller argues is sufficient to support a finding that he was "singled out" for an impermissible purpose- *Parnell* prong 1.

*Parnell* prong 2 is also satisfied.  Here, as argued in Section II, Waller has been subjected to delayed federal prosecution for exercising a constitutionally-protected right; his First Amendment right to free speech.  The historical progression of the Government's case suggests no other basis

for the delayed filing of the present case when federal actors represented to Waller a different resolution; only to become angered by the publication of this book. A book, that is by all legal authority, within Waller's rights to publish. Again, notwithstanding its perceived decency.

Based on the above, it is clear that the decision to charge Waller was selective, and therefore, in violation of his rights to due process. Accordingly, the federal charge must be dismissed.

### IV.  Failure to State an Offense/Alternative Request for Bill of Particulars

There is also the issue of the manner in which the present federal charge(s) were filed. On its face, the Indictment fails to state facts sufficient to charge Waller with an offense against the United States, and particularly with an offense in violation of what is referred to as Interstate Domestic Violence pursuant to 18 U.S.C. §2261(a)(1). As written, the Indictment is vague, ambiguous and indefinite. Accordingly, the Indictment does not comply with the requirements of Rule 7 F.R.Cr.P., is not in conformity with the Fifth and Sixth Amendments of the United States Constitution in that it does not sufficiently apprise Waller of the charge(s) against him, and does not protect him from the instance of double jeopardy as discussed in previous sections. In short, the death of Jacque Sue Waller was, and remains, a State crime. It follows that the present charge should then be dismissed.

In the alternative, and pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, Waller requests this Court direct the Government to file a written bill of particulars as to the following matters alleged in the Indictment:

1)  The exact dates, times, and places, including street addresses and locations wherein the alleged acts set forth in the Indictment occurred, specifically as they relate to the "travel" element of the charge in issue.

2. The names and addresses of persons who participated in, saw, or who are otherwise qualified to testify in court, about the actual commission of the act alleged in the Indictment, specifically as it relates the "travel" element of the charge in issue.

3. The manner in which the crimes charged in the Indictment were allegedly committed.

As grounds for the foregoing motion, Waller states that he matters hereinabove requested are essential to enable him to prepare his defense and to avoid surprise at the trial. The information sought to clarify the Indictment, is within the particular knowledge of the United States Attorney and cannot be obtained by means other than legal process.

### V. Conclusion

As provided above, Waller submits that the present Indictment be dismissed because it presents a clear violation of the Double Jeopardy Clause in that there exists an exception to the dual sovereignty doctrine under *Bartkus*, that the Indictment violates his due process rights based on the vindictive and selective nature of the delayed prosecution, and that is does state facts sufficient to charge him with an offense against the United States.

WHEREFORE, for the foregoing reasons, Defendant James Clay Waller, II, requests this honorable Court issue its Order dismissing the Indictment, or as it relates to Argument IV-Failure to State an Offense, Order the Government to furnish a Bill of Particulars, and for any and further relief this Court finds just and prudent under the circumstances.

Respectfully Submitted,

THE LAW OFFICES OF JOHN M. LYNCH, LLC

<u>E/S John M. Lynch</u>
JOHN M. LYNCH #56604MO
7777 Bonhomme Avenue, Suite 1200
Clayton, MO 63105
(314) 726-9999
(314) 726-9199 Facsimile
jlynch@lynchlawonline.com

***Attorney for Defendant James Clay Waller, II***

**Certificate of Service**

   I hereby certify that on June 1, 2017, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Larry H. Ferrell<br>
Assistant United States Attorney<br>
555 Independence Street, Room 3000<br>
Cape Girardeau, MO 63703

                 E/S John M. Lynch