IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:16CR00058AGF (ACL) |
| | ) | |
| JAMES CLAY WALLER, II, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT WALLER'S PRETRIAL MOTIONS

Comes now the United States of America, by and through its attorneys, Carrie Costantin,

Acting United States Attorney for the Eastern District of Missouri, and Larry H. Ferrell,

Assistant United States Attorney for said District, and for the Government's Response to

Defendant's Pretrial Motions, states and alleges as follows:

## I. FACTS

On Wednesday, June 1, 2011, Jacque Sue Waller and the defendant, James Clay Waller,

II ("Waller"), were separated and in the process of filing for divorce.  The Wallers had been

married for approximately 17 years and had three children, triplets, age 5 at that time.  The

couple separated in March 2011, and Jacque and the children moved to Ste. Genevieve County,

Missouri to live with Jacque's sister, Cheryl Brenneke.  Waller was living at 1121 Woodland in

Jackson, Missouri.

Following their separation, the Wallers were sharing custody of their children, though

Jacque had primary custody and Waller received visitation.  Both Jacque and the defendant were

involved in romantic relationships with someone else by this time.  Jacque was involved in a

relationship with Richard Herbst who also lived in the Ste. Genevieve area.  The couple had recently acquired a home they planned to live in together along with Jacque's children, once the divorce was final.  At the time, Waller had a girlfriend, Rebecca Barringer, who lived in Illinois.

Over Memorial Day weekend, immediately prior to June 1, 2011, the Waller children were visiting with their father.  Jacque picked up two of the children, Avery and Addison, on Sunday, May 29, 2011.  Maddox stayed with his father for a few more days.  On the night of May 31, 2011, Waller and his son, Maddox, stayed at Barringer's home.  On Wednesday morning, June 1, 2011, Waller traveled from Illinois to Cape Girardeau, Missouri.  He left Maddox with Barringer.

On June 1, 2011, at approximately 3:00 p.m., Jacque and Waller attended a meeting she had arranged at her lawyer's office, Jeffrey Dix, in Cape Girardeau to discuss filing the necessary court documents in their divorce proceedings.  Following the discussion, each party was required to sign a document to be filed with the court to begin the divorce proceedings.  Jacque signed the document.

Following the meeting, at approximately 3:50 p.m., Jacque called her sister Cheryl and reported that she was on her way to pick up her son Maddox from Waller's home and she would then return "straight home" to Ste. Genevieve County.  Jacque spoke with Richard Herbst stating she was on her way to pick up Maddox from Waller's home and would then be returning to her home and would see him then.  Their conversation ended at 4:05 p.m. with Jacque stating, "I'm here."  Jacque Waller was never seen or heard from again.  Evidence would later show she had been brutally murdered, strangled and beaten, and stuffed into a trash can in the back of Waller's truck.  Waller then drove to a meeting with Barringer and his son, with his sons's mother's body still in the back of the truck.  As evidence would later reveal, Waller then buried her body in a

2

grave he had dug the day before, at a remote location across the Mississippi River in Illinois, Devils Island.  Waller had strategically picked this location to ensure the body would never be found.

When Jacque did not arrive at home and could not be found, Cheryl Brenneke eventually reported her sister as a missing person to the Jackson, Missouri Police Department.  Brenneke reported that Jacque told her numerous times that Waller has threatened to kill her and the children before, and she was very worried.

A subsequent check of Jacque's computer showed she had in fact documented Waller's threats to kill her and the children.  Waller threatened repeatedly that a divorce would be her death sentence.  The specifics of several of Jacque's diary entries are set forth in Ex. 1.

### Waller's First Contact with Law Enforcement

On June 2, 2011 at approximately 12:30 am, Waller, in an effort to cover up the murder, called the Jackson Police Department to make a missing person report on his wife.  Waller advised they met at their attorney's office and Jacque was supposed to bring him a key to their post office box to his residence.  Waller reported that Jacque later arrived at his residence, but he could not recall the time.  Waller advised they sat and talked and then napped.  Waller reported that after the nap, they started to argue about the bankruptcy and then Jacque left the residence on foot.  Waller advised he left the residence and when he returned, her car was gone.

On June 2, 2011 at approximately 10:04 am, Jacque Waller's vehicle was located on the shoulder of Interstate 55 northbound near the 105 mile marker in Jackson, Missouri.  Jacque was not located in or around the vehicle.  Her purse, keys and cell phone were not in the vehicle.  The car had a flat tire.  Evidence would later disclose this charade was orchestrated by Waller. Again to cover up the murder.

3

**First Search of 1121 Woodland – Search Warrant**

On June 2, 2011 at approximately 6:05 pm, a state search warrant was executed at Waller's residence in Jackson, Missouri. During the search, officers observed a hallway area in the home in which children's play mats and toys had been placed on and along the carpet.  The officers unfortunately did not examine the floor under the mats that evening.  Nothing of evidentiary value was found.  A copy of the search warrant is attached.

The next day, June 3, 2011 at approximately 12:45 p.m., the three children were taken into protective custody.  The children were transferred to the custody of the Missouri Children's Division and temporarily placed with Cheryl Brenneke, Jacque's sister.

**Second Search of 1121 Woodland – Owner's Consent**

On June 6, 2011, law enforcement authorities conducted a consent search at 1121 Woodland, Jackson, Missouri after the home owner, Scott Gibbs, reported that a piece of carpet was missing from the residence.  Waller had moved out of the residence by this time.  As a result of the search, the officers located and collected blood spatter evidence from two walls inside the residence.  Blood spatter occurs when blood moves from one object through the air and lands on another object.  Later, they also located and collected several pieces of cut up carpet and carpet pad from the depths of a crawl space underneath the residence.  The carpet pieces and carpet pad were hidden out of view in the back of the crawl space.  One piece of cut up carpet had a large apparent bloodstain that was visible on the bottom of the carpet and was hidden separate from the others in the crawl space.  The Missouri State Highway Patrol Crime Lab later reported that the blood located on the two walls and the blood on the piece of carpet contained Jacque Waller's DNA.

**Waller's Interviews with Law Enforcement Authorities**

4

Waller was interviewed by law enforcement authorities on numerous occasions beginning on the day of Jacque's disappearance.  Each time disavowing any knowledge of Jacque's disappearance.

**July 11-13, 2011 Interviews at FBI-Cape Girardeau**

Among Waller's interviews are two specific interviews that occurred on July 11 and July 13, 2011.  The evidence will show that on July 11, 2011, FBI SA Brian Ritter telephonically contacted Waller, who was not in custody, and asked if he would be willing to talk about the investigation into the disappearance of his wife, Jacque (as previously discussed between SA Ritter and Waller on July 5, 2011).  Waller voluntarily agreed to meet with SA Ritter at the Cape Girardeau Resident Agency (CGRA) of the FBI in approximately one hour.  SA Ritter made no threats, promises or misrepresentations in order to induce Waller to come to the office, or to make statements, nor did he employ any physical threats or intimidation.

Waller arrived at approximately 11:15 a.m. and told SA Ritter that he did not have an attorney representing him for any criminal case because he had not done anything wrong.  Waller mentioned that his child custody attorney had advised him not to speak to law enforcement. Nevertheless, Waller agreed to speak to SA Ritter. Waller advised that he understood he was at the CGRA voluntarily, was free to leave at any time and was not under arrest.

Waller asked SA Ritter if the interview was being recorded, and SA Ritter told him it was not.  At 2:18 p.m., Waller was provided with water. At numerous times during the interview, Waller was asked whether he needed to use the restroom, but he declined.

When asked about the details of the night his wife went missing, Waller advised that he was hesitant to provide those details and would tell his story to a jury. However, he went on to provide various information to investigators regarding his wife's disappearance. At the

5

conclusion of the interview, Waller advised he would be willing to return and talk to the investigating agent in a few days to further discuss the details of the interview and review the interview report. The interview ended, and Waller left the office.

During this interview, Waller denied that Jacque came to his house to pick up their son Maddox and claimed that she came to the house for personal reasons and to talk about the bankruptcy. Waller advised that Maddox was with his girlfriend at the time Jacque came by and was not at his house. During the interview, Waller was asked if Jacque had ever been injured in his house. Waller paused and advised "yes" but did not want to talk about it and that "it was not a big deal." Waller later advised that his wife was injured while at the house as a result of an accident in the kitchen that caused her face to bleed. Waller stated, "She started bleeding and ran to the bathroom." Waller said she used her hands to catch the blood and ran through the house toward the master bathroom. He said Jacque tripped in a hallway and fell down. Waller stated Jacque started to scream and stood up and was dizzy. Waller advised Jacque fell back down and laid there. He said Jacque was conscious and was "thrashing around and was pissed." Waller claimed he and Jacque cleaned up the blood together. Waller said he hadn't told the police about the blood because "it was no big deal." Waller then admitted he cut up and removed the carpet with the blood on it and hid it in the crawl space where it was later found. He said he removed the carpet after the police conducted the search warrant at the residence and was told by police that he "could do whatever he wanted with the house." He removed and hid the carpet because he did not want the homeowner to find it and think that something wrong had happened. Waller claimed when Jacque left the house, she was mad at him because he would not give her car keys to her. Waller ridiculously claimed he threw the keys up in the air toward the driveway and they

6

got stuck in a tree.  Waller claims he last saw Jacque walking away on foot.  Waller denied that

he had anything to do with his wife's disappearance.

Waller was interviewed again on July 13, 2011.  On July 13, 2011, SA Ritter attempted to

call Waller at approximately 12:52 p.m. with no answer.  Waller called SA Ritter back at

approximately 1:13 p.m. and Ritter asked if he would be willing to follow up on details from his

July 11, 2011 interview. Waller voluntarily agreed and met SA Ritter at the CGRA of the FBI

once again. The interview took place beginning at approximately 1:48 p.m. and ended at

approximately 3:50 p.m. Again, at no time did SA Ritter or any other officer make any threats,

promises or misrepresentations to Waller to induce him to make statements, nor did law

enforcement physically intimidate or coerce him in any way.  During this second interview,

Waller repeated and elaborated on many of the same facts provided in his July 11th interview.

Despite extensive efforts by local, state, and federal law enforcement agencies, as well as

those of hundreds of volunteers, and despite extensive local, state, and national media coverage,

the location of Jacque Waller's body remained a mystery to all but one man, James Clay Waller.

**Waller Threatens the Life of Jacque's Sister, Cheryl Brenneke**

On July 26, 2011, Cheryl Brenneke contacted the Cape Girardeau County Sheriff's

Department concerning a threat to do physical harm to another that she found posted on an

internet site known as "Topix."  The threat was found under a discussion entitled "Police Search

for Missing Jackson Woman." The content of the posting was as follows:

> "You are dead I promise if those kids get hurt, your fault, accident, nobodys fault.
> Your dad threaten clay, I know he's all talk, I will get you 5, 10, 25 years from
> now. You have it coming."

On September 7, 2011, a grand jury for the Southeastern Division of the Eastern District

of Missouri returned a one-count indictment charging Waller with interstate transmission of a

7

communication containing a threat to injure the person of another, in violation of Title 18, United States Code, Section 875(c).

On October 3, 2011, Waller entered a plea of guilty to the indictment before United States District Judge Stephen N. Limbaugh, Jr.  On January 3, 2012, the Court varied upward and imposed a final sentence of 60 months imprisonment, the maximum possible punishment.

## October 12-13, 2011 Interview at Pemiscot County Jail

Waller was interviewed on October 12, 2011 at the Pemiscot County Jail in Caruthersville, Missouri.  At this time, Waller had been arrested on federal charges of making an interstate threat in violation of 18 U.S.C. § 875(c).  Waller had been presented to United States Magistrate Judge on September 2, 2011 for an initial appearance and had a detention hearing on September 8, 2011.

During the interview on October 12, 2011, SA Ritter advised that he was not there to talk to him about the federal charges. Waller was in custody at the time and informed FBI SA Brian Ritter that he did not have an attorney concerning the investigation of his missing wife (Jacque Waller) and was willing to talk to SA Ritter.  SA Ritter advised Waller of his *Miranda* rights using an "Advice of Rights" form.  The form covered:  the right to remain silent; that anything Waller said could be used against him in court; the right to talk to a lawyer before answering any questions; the right to have a lawyer present during questioning; that a lawyer would be appointed if he could not afford a lawyer; and that if he decided to answer questions without a lawyer, he had the right to stop answering at any time.

Waller stated that he understood those rights, placed his initials next to each right and signed the waiver at approximately 12:40 p.m.  SA Ritter made no threats, misrepresentations or

promises of leniency to Waller to induce a statement.  Nor did SA Ritter physically intimidate Waller into make a statement.

### State Murder Prosecution

Meanwhile, continuous efforts to locate Jacque's body were unsuccessful, and with nearly two years having passed, the Cape Girardeau County Prosecuting Attorney filed a first degree murder charge against Waller on April 23, 2012.  First degree murder is punishable only by life imprisonment without parole or death.

### Plea Agreement Reached With the State

One year later, on May 21, 2013, Waller successfully ransomed the return of Jacque's body. Waller's attorney, Public Defender Chris Davis, contacted Assistant Prosecuting Attorney Angel Woodruff, with the Cape Girardeau County Prosecuting Attorney's Office, and offered to produce Jacque's body if a "deal" could be reached.  Mr. Davis then met with Assistant Prosecuting Attorney Angel Woodruff at her office in the Cape Girardeau County Courthouse. There they negotiated the terms of their agreement.  Prosecutor Woodruff typed up the offer, signed it, and presented it to Mr. Davis.  *Neither the United States Attorney's Office, nor any federal agent or agencies, participated in the formulation or execution of this agreement.*  The agreement required Waller to give up the location of Jacque's body in exchange for a reduced charge of murder in the second degree and a sentence of 20 years to run concurrently with his five year federal sentence. In essence, a fifteen year sentence, when Waller has been facing life imprisonment without parole.  As part of the agreement, Waller agreed to give an interview with authorities, providing the details of Jacque's murder. See Ex. 2.  After the agreement was reached, and the terms of the plea agreement were agreed to by Circuit Judge Benjamin F.

Lewis, Waller's attorney advised Prosecutor Woodruff the body was buried in Illinois on Devil's Island.

On May 22, 2013, the Illinois river bank, across from Honker's boat dock, was searched but the body was not located. The search continued without success. During these searches, some of which involved the presence of Waller and his attorney, law enforcement authorities spoke with Waller on occasion, in an attempt to locate the burial site.  The Government will not offer any statements made during these communications as evidence in its case in chief.  Finally, on May 28, 2013, Jacque's body was recovered.

*On May 29, 2013, the United States Attorney's Office for the Eastern District of Missouri learned for the first time that a plea agreement had been reached between Waller and the State of Missouri and that the body had been recovered in Illinois.*

**May 22, 2013 Statements During Search of Red Star Boat Ramp & Surrounding Area**

Because Waller moves to suppress the statements made during the search for Jacque Waller's body, the circumstances of those conversations will be provided.  Pursuant to the agreement reached between the parties, Waller's attorneys and Cape Girardeau County Assistant Prosecuting Attorney (APA) Angel Woodruff requested that Waller be transported from the Cape Girardeau County jail to the Red Star Boat Ramp in Cape Girardeau, Missouri on the Mississippi River so that Waller could guide investigators in a search of the Illinois side of the river just south of Devil's Island for the burial site of Jacque Waller.

Prior to this time, Waller had been advised of his *Miranda* rights on several occasions and waived those rights.  Additionally, Waller was already familiar with those rights from his prior law enforcement employment.  Additionally, Waller was represented by counsel on state murder charges and had the benefit of his lawyers' advice. In an effort to avoid the first degree

10

murder charge (trial of which was looming) and a significantly higher sentence, Waller and his attorneys negotiated with APA Angel Woodruff and offered that, in exchange for Waller providing investigators information allowing for the recovery of Jacque Waller's body, Waller would be permitted to plead to second degree murder and receive a sentence of 20 years' imprisonment. While Waller's statements were made in an attempt to induce leniency from the state prosecution, they were made upon advice of counsel and in no way coerced.

Waller voluntarily told investigators details to assist in their search for the burial site and made various admissions about where he buried Jacque's body.

### Waller Interviewed as Part of Plea Agreement

On June 30, 2013, Waller's interview took place at FBI headquarters in Cape Girardeau. The interview was led by FBI Special Agent Brian Ritter.  The FBI headquarters was selected among other reasons, to ensure the greatest privacy, as the plea agreement had yet to be made public.  The parties agreed on Agent Ritter to lead the interview because of hostilities between Waller and the lead state investigator, David James, and the fact that Waller was familiar with Ritter and had reached out to Agent Ritter during the investigation.  Waller was represented by his attorneys, public defenders Amy Comean and Chris Davis. At the beginning of the interview, Waller was advised of the details of the plea agreement by Assistant Prosecuting Attorney Angel Woodruff and by his attorney, Amy Comean. Waller was advised that the agreement did not and could not include any promise that he would not be prosecuted in federal court or in the state of Illinois. Waller was advised that his statements could be used against him. Waller replied, "For this," to which Prosecutor Woodruff answered, "for anything." Waller advised he understood that and that he would be ready to proceed after consulting with his attorney. He consulted with Ms. Comean and then proceeded with the interview. Prior to any questioning, Waller was advised of

11

his Miranda rights, including that the fact that "You have the right to remain silent" and "anything you say can be used against you in court." Waller advised he understood all of his rights and, in the presence of counsel, agreed to waive his rights, and did so on a written advice of rights form. (Ex. 3) The interview proceeded and was video recorded.  It was later transcribed. (Ex. 4)

During the interview, Waller made many damaging admissions.  He made it clear that his previous statements, that if Jacque got a divorce it would be her death warrant, were indeed true. He stated, "I knew if she fulfilled in taking those kids from me, it was over for her." He said that when Jacque told him she wanted a divorce on May 1st, he said okay because he knew she was going to die as soon as she did it. He stated, "I knew as soon as the attorney thing was over, it was over." He admitted digging her grave the morning before they were to meet with the attorney. He said he spent several hours digging the grave. He stated that later that day, he flew his helicopter over the area. He stated he spent the night with his girlfriend, Rachael Barringer, in the state of Illinois. The next day, he left her residence and traveled to the State of Missouri where he met with Jacque and her attorney. He claimed that after the attorney's meeting, Jacque wanted to have sex with him at his house and that is why they met there. He claimed that he accidently bumped her nose and it started bleeding profusely. They then got into an argument, which he alleged included her statement that he would have difficulty in seeing his kids. Waller claimed that he then gave her a "brachial stun," by slapping her in the throat. He then punched her in the nose and pressed his forearm on her neck until she died. At one point, he stated that that may have taken five minutes. Waller said he then put her body in a trashcan and met his girlfriend on the parking lot of ToysRUs. He was pulling his brother's boat, and following the meeting he traveled to Honker's boat dock. He loaded the trashcan with Jacque's body into the

12

boat and then took the body across the Mississippi River to an island on the Illinois side where he had dug the grave the day before. He buried Jacque's body in the grave, took a bath in the river, then sank the trashcan and his clothes in the river. He returned to his truck, changed clothes, and parked the boat on the Ace Hardware parking lot.

Waller's version of the facts is inconsistent with the evidence, including the autopsy report. An autopsy was conducted by Chief Medical Examiner Mary E. Case on May 30, 2013. Forensic Anthropologist, Lyndsay H. Trammell, consulted. Dr. Trammel concluded that trauma was noted to the cranium, mandible, and hyoid. There were multiple areas of the cranium consistent with blunt force injury. The injuries to the cranium include:

(1) a depressed skull fracture on the right lateral aspect of the frontal bone with a radiating fracture;
(2) fractured right zygomatic bone;
(3) fractured right maxilla with two radiating fractures;
(4) fractured occipital bone;
(5) the right zygomatic and a section of the right maxilla were separated from the splanchrocranium by blunt force; and
(6) portions of the right maxilla and the zygomatic arch of the temporal bone sustained blunt force.

Additionally, the hyoid bone was broken which is consistent with strangulation.

The cause of death was determined to be neck compression (strangulation) and cranial cerebral blunt force trauma.

### Pursuant to the Plea Agreement, Waller Pleads Guilty to Murder Second and Receives a 20-Year Concurrent Sentence

After the interview, three days later, on June 6, 2013, Waller was charged in an amended information with, and pled guilty to, the offense of Second Degree Murder.  (Ex. 5, Transcript of Plea) Prior to accepting the plea, the Prosecuting Attorney was required to place the plea agreement on the record. Once again, the Prosecuting Attorney made it clear that the plea

13

agreement in no way bound the federal government or the State of Illinois, and any charges

Waller might subsequently face in either of those jurisdictions were completely separate matters:

> THE COURT: What is the plea agreement in this case, Ms. Woodruff?

> MS. WOODRUFF: Judge, there is an agreement in this case. The State agreed to amend this charge to murder in the second degree and recommend a sentence of 20 years to serve and dismiss Counts II and Ill and in return Mr. Waller had to provide the location of Jacque Waller's body, law enforcement had to be capable of recovering her body and then Mr. Waller had to sit down and give an accounting of how he killed Jacque Waller.

> Mr. Waller has satisfied all three of those conditions. We did recover her body. He did lead us to her and he did sit for an interview on Monday to give his recitation of events. In return he receives murder in the second degree charge and an agreement for 20 years to serve.

Despite the assertions in his motion to the contrary, Waller knew without a doubt the plea

agreement did not "bind" any other state or federal authority.  Prosecutor Woodruff made it

abundantly clear that she had no authority to bind the State of Illinois, or the federal government,

and that any charges he might face in those jurisdictions were completely unrelated and had

nothing to do with this agreement.

> I would note that I cannot bind any other authorities. That means I cannot bind the State of Illinois and I also cannot bind the federal government. Any charges that Mr. Waller would face from those agencies would be completely separate and has nothing to do with my agreement with him.

> Q (By the Court) Is that your understanding of the plea agreement, Mr. Waller?

> A Uh-huh. Yeah."  (Emphasis added)

> (Ex. 5, Transcript of Guilty Plea, pp. 4-5)

Following the plea, Circuit Judge Benjamin F. Lewis sentenced Waller to twenty years in

the Missouri Department of Corrections to run concurrently with Waller's five-year federal

14

sentence.  Judge Lewis concluded by stating in open court:  "That is not what you deserve, but it will have to do."

*The United States Attorney's Office had no involvement whatsoever with regard to the plea proceedings.*

Dissatisfaction was expressed by members of the family, the Court, the prosecution, and the community that the sentence was grossly insufficient to address the seriousness of the offense or to insure the safety of the community. As stated by Jacque's sister, Cheryl Brenneke, "I did not want this deal," but "my mother and father, and these children, deserve to bury her though." An article in the local paper entitled "Deal in Killing of Estranged Wife Prompts Dissatisfaction," summed up the situation well, in its opening paragraph:

> "A frustrated judge, begrudging prosecutors and chagrined family members conceded Thursday that offering a plea deal to a southeast Missouri man accused of killing his estranged wife, a mother of 5-year-old triplets who was missing for almost two years before her body was found last week on an island in the nearby Mississippi River, was inadequate." Ex. 6.

### Involvement of the United States Attorney's Office

It was not until after Waller's plea and sentence in state court on June 6, 2013, the United States Attorney's Office, in conjunction with the Federal Bureau of Investigation, began an effort to determine if Waller's conduct had violated federal law; whether sufficient admissible evidence could be amassed to support a conviction for such offense; and whether, considering all factors, it would be in the best interest of justice to pursue an independent prosecution.  The Government has concluded the answer to each questions is a resounding "yes."

The Government obtained and reviewed thousands of pages of investigative reports, depositions and other documentary evidence involving a tremendous number of potential witnesses.  In addition to the currently existing evidence, the Government sought to develop a

15

federal case against Waller that if necessary, could be presented without the use of Waller's interview statement on June 30, 2011 or his admissions at the time of his plea on June 6, 2016. Through our own federal investigation, the Government sought to establish, independent of Waller's confession, that he premeditatedly dug Jacque's grave the day before her murder and that he crossed the Missouri/Illinois state line on the morning of Jacque's death, with the intent to take her life.  Among these efforts would be the interviewing of former cellmates and other prisoners in institutions across the United States where Waller had been held.  Numerous witnesses were located who would testify that Waller admitted the details of the murder to them.

A final round of interviews with cellmates in January of 2016 proved highly successful. Two of Waller's former cellmates not only recalled Waller admitting killing his wife and burying her in a grave he had dug prior to the murder, but for the first time provided authorities with direct evidence that Waller had allegedly been involved in the preparation of a manuscript detailing how and why he murdered his wife.

### Discovery of Waller's "Manuscript" Confessing the Details of the Murder

On January 25, 2016, FBI agents interviewed an inmate at the Federal Correctional Institution in Pollack, Louisiana. This inmate lived with Waller for six months. The inmate advised authorities Waller told him that he killed his wife. He stated Waller told him that prior to the murder of his wife, he dug a hole on a sandbar to bury her, and after the murder he dumped her body in the hole and added fertilizer to help the body decompose. He also said that Waller "wrote a book" while in prison detailing the homicide. A search of Waller's cell failed to disclose any such book.

On February 17, 2016, FBI agents in Florida interviewed another inmate at FCI Marianna, Florida. This inmate stated he and Waller were in prison there together. He told the

agents that Waller discussed the murder with him in great detail including the fact Waller had

dug the grave on an island on the Mississippi River before he murdered his wife. The inmate also

said he knew Waller was working on a book while they were in prison and in fact, Waller had

given him a draft of the book to read. This inmate told authorities Waller had a lady in Louisiana,

the mother of another inmate, who was acting as Waller's power of attorney and was assisting

Waller in an attempt to get the book published. The inmate later provided authorities with the

name Linda Perry of Baton Rouge, Louisiana.

Ms. Perry was located and a grand jury subpoena was issued for the production of the

manuscript. The subpoena was served on March 7, 2016. Ms. Perry verified that she had indeed

been working with Waller to publish a book. She verified she had a copy of the book. The next

day, March 8, 2016, Ms. Perry turned over her copy of the manuscript to agents for the FBI.

(Ex. 7)

This chilling manuscript was entitled "If You Take My Kids, I Will Kill You." The book,

told firsthand, *contains a written confession of how Waller murdered his wife and contains

incriminating detail after incriminating detail of the crime*. In a chapter entitled "Show Stopper,"

it is detailed how Waller planned to kill his wife, how he dug her grave the day before, and how

he brutally murdered her. In the Introduction to the book, the author indicates that this book was

"meticulously written as told by Waller himself, in a way that he reveals"[1]

- How he kills his wife
- His motive
- What happened during the final hours
- Waller's nearly successful murder plot
- Waller's downfall and escape from the death penalty

---

[1] It is the Government's position that Waller did not actually write the book or seek its publication. The manuscript was actually written by inmate Cedric Dean, as told to him by Waller. Any effort at publication was handled by Perry. No book was ever published.

In the book, Waller boasts repeatedly how his prior law enforcement training enabled him to elude the authorities and how Jacque was responsible for her own death because she sought primary physical custody of his children. He claimed he was a G-man at heart and had to put on his "police cap of consciousness" to deceive authorities and get away with murder. In the book, Waller shows little genuine remorse and often demonstrates an attitude of arrogance and justification.

The book cover each element of the federal offense. It contains admissions that Waller had made up his mind to kill Jacque when she announced she was getting the divorce and "taking the kids." Excerpts include:

> "Killing my wife was a no-brainer."
> He told her multiple times- "If you take my kids, I will kill you."
> Jacque called him on the 28th and said she was going to schedule an appointment to finalize the divorce and she was going to take the kids.
> "When she said that, she was dead and didn't even know it."
> He spent the night in Illinois before the murder.
> That when she signed the divorce papers on June 1st, he knew "she was signing her death certificate."

In a chapter entitled "See you around," it is claimed, as he dumped Jacque's body in the grave, he stood over her with these final words, "You really shouldn't have tried to take the kids, see you around."

Cape Girardeau County Sheriff John Jordan, and the Honorable Benjamin F. Lewis, the sentencing judge in Waller's state case, expressed their desire that federal charges be pursued, eventually writing letters to the Department of Justice making such request.

Sheriff Jordan refers to the Waller homicide as the highest profile murder in the history of Cape Girardeau County. Sheriff Jordan states that Waller "ransomed" the return of Jacque's body for what was in effect a 15-year sentence. The Sheriff points out that Waller's law

18

enforcement experience no doubt helped him to commit the crime and conceal and confound the investigation. Sheriff Jordan implored the Department of Justice to bring justice in this case.

Judge Lewis stated that in his 16 years as a judge, two criminal cases stand out among thousands. The first was a serial killer, Timothy Kracjir, who killed four women in Cape Girardeau and many others in various other states. The other was Clay Waller. Judge Lewis called Waller a killer who is completely without a conscience and expressed his opinion that if ever released, it would only be a matter of time before Waller kills again. Judge Lewis urged the Department to file whatever additional charges may be available to punish Waller.

The murder of Jacque Waller was but the last chapter in Waller's long history of violence, abuse and intimidation toward females, particularly domestic partners. Waller's history of domestic abuse included allegations of abuse against domestic partners over a period of nearly twenty years, a summary of the reports concerning Waller's history of domestic abuse is attached.  (Ex. 8)

With this information, the United States Attorney's Office for the Eastern District of Missouri authorized a petition to the United States Attorney General for authority to prosecute Waller under 18 U.S.C. § 2261 for the offense of Interstate Domestic Violence, an offense which carries the possibility of life imprisonment.

**Procedure for Filing a Successive Federal
Charge – Obtaining a Petite Waiver**

<u>**Purpose**</u>

Because Waller challenges the indictment on the grounds the instant prosecution is frivolous, does not address a substantial federal interest, and is motivated only to punish Waller for the manuscript recovered by federal agents, the approval process for authorizing a successive

19

federal prosecution, ultimately requiring approval from the Deputy Attorney General of the United States, and the matters addressed in such an application are pertinent.

The dual and successive prosecution policy "Petite Policy" is set out at Section 9-2.031 of the United States Attorney's Manual.  (USAM 9-2.031)  The policy establishes guidelines for the exercise of discretion by appropriate officers of the Department of Justice in determining whether to bring a federal prosecution based on substantially the same acts or transactions involved in a prior state or federal proceeding.

The stated purpose of the policy is to vindicate substantial federal interests through appropriate federal prosecutions, to protect persons charged with criminal conduct from the burdens associated with multiple prosecutions and punishments for substantially the same acts or transactions, to promote efficient utilization of Department resources, and to promote coordination and cooperation between federal and state prosecutors.

### Substantive Prerequisites for Approval

The policy precludes the initiation of a federal prosecution, following a state prosecution based on substantially the same acts or transactions unless three substantive prerequisites are satisfied:

- First, the matter must involve a substantial federal interest;
- Second, the prior prosecutions must have left that interest demonstrably unvindicated; and
- Third, applying the same test as applicable to all federal prosecutions, the Government must believe that the defendant's conduct constitutes a federal offense, and that admissible evidence probably will be sufficient to obtain and sustain a conviction by an unbiased trier of fact.

### Substantial Federal Interest

20

The determination of a substantial federal interest is made on a case-by-case basis, applying considerations applicable to all federal prosecutions.  *See* Principles of Federal Prosecution, USAM 9-27.230.[2]

The prosecution of Clay Waller involves a very substantial federal interest; the interest in protecting domestic partners, especially women, from physical abuse, indeed, from murder.  This is a paramount federal interest as reflected in the creation of the very offense of Interstate Domestic Violence, 18 U.S.C. § 2261(a) in 1994 as part of the Crimes Against Women Act.  The Attorney General and the President of the United States have continued to reaffirm its importance and their commitment to this goal.

> *"On average, three women are murdered every day in this country by a boyfriend, husband, or ex-husband.  Experts estimate that, for every victim of domestic violence who is killed, an additional nine nearly lose their lives.  And many others – including children, coworkers, neighbors, and police officers – are injured or killed while trying to stop violent acts, or simply because they are in the wrong place at the wrong time.  This is why our nation's Department of Justice – and our colleagues across the Administration – are determined to fight back."*

Remarks from former United States Attorney General Eric Holder, Domestic Violence Homicide Prevention Initiative Announcement, Rockville, Maryland, March 13, 2013.

"Interstate Domestic Violence" is a federal crime.   Title 18, United States Code, § 2261(a)(1) provides that "a person who travels in interstate commerce … with the intent to kill, injure, harass, or intimidate a spouse …, and who, in the course of or as a result of such travel, commits or attempts to commit a crime of violence against that spouse … shall be punished a provided in subsection (b)."  This provision was originally passed by Congress 1994 as part of

---

[2] Those factors include (1) federal law enforcement priority; (2) the nature and seriousness of the offense; (3) the deterrent effect of prosecution; (4) the person's culpability in connection with the offense; (5) the person's history with respect to criminal activity; (6) the person's willingness to cooperate in the investigation or prosecution of others; and (7) the probable sentence or other consequences if the person is convicted.

the Violence Against Women Act (VAWA) in recognition of the severity of crimes associated with domestic violence.   VAWA has been reauthorized three times, most recently in 2013.

Since its initial passage in 1994, preventing domestic violence has been a top priority of the United States Department of Justice (DOJ).  Shortly after VAWA was enacted into law, the DOJ created the Office on Violence Against Women (OVW).  The mission of the office "is to provide federal leadership in developing the national capacity to reduce violence against women and administer justice for and strengthen services to victims of domestic violence, dating violence, sexual assault, and stalking."  Since its inception, OVW has awarded over $6 billion dollars in grants to help victims of domestic violence and to hold offenders accountable for their crimes.

The importance of VAWA has been stressed by high-ranking officials on countless occasions.  In an address at the White House on April 18, 2012, for example, former Attorney General Holder stated:

> Recent statistics show that between 1993 – the year before then-Senator Joe Biden authored this transformative legislation – and 2010, the number of women killed by an intimate partner declined by 30 percent.   And annual rates of domestic violence against women plummeted by two thirds.    These statistics are extraordinary.  They speak to the importance of this important law – and to the immense power of the critical partners gathered here – in strengthening the criminal justice response to violence against women; in improving access to essential services for victims of these crimes; and in directly combating a problem so widespread that one study suggests it affects roughly one in four women at some point during their lifetime.  Former Attorney General Eric Holder, White House Event on the Violence Against Women Act, Washington DC, April 18, 2012.

Then Attorney General Holder proceeded to highlight the importance of federal action in this area, pointing out that "As a former United States Attorney for the District of Columbia, I helped formulate an aggressive response – by establishing a domestic violence task force within my office and enlisting the help of law enforcement officers and community leaders to address these crimes throughout our nation's capital."

22

Recently, former President Obama issued a Presidential Proclamation to address

the domestic violence crisis in the United States:

> Domestic violence impacts women, men, and children of every age, background, and belief. Nearly 1 in 4 women and 1 in 7 men in the United States have suffered severe physical violence by an intimate partner. Victims are deprived of their autonomy, liberty, and security, and face tremendous threats to their health and safety. During National Domestic Violence Awareness Month, we reaffirm our dedication to forging an America where no one suffers the hurt and hardship that domestic violence cause – and we recommit to doing everything in our power to uphold the basic human right to be free from violence and abuse.
> While physical marks may often be the most obvious signs of the harm caused by domestic violence, the true extent of the pain goes much deeper. *** These heinous acts go against all we know to be humane and decent, and they insult our most fundamental ideals. We all have a responsibility to try to end this grave problem.
>
> Prior to the passage of the Violence Against Women Act (VAWA), many did not view domestic violence as a serious offense, and victims often had nowhere to turn for support. VAWA significantly transformed our Nation – it enhanced criminal justice response to violence against women and expanded survivors' access to immediate assistance and long-term resources to rebuild their lives. *** My Administration has worked hard to build on the progress of the past several decades and improve domestic violence prevention and response efforts.
>
> ***
>
> Though we have made great progress in bringing awareness to and providing protections against domestic violence, much work remains to be done.
>
> ***
>
> Safeguarding and opening doors of opportunity for every American will remain a driving focus for our country – and we know that crimes like domestic violence inhibit our Nation from reaching its fullest potential. This month, let us once again pledge our unwavering support to those in need and recognize the advocates, victim service providers, and organizations who work tirelessly to extend hope and healing to survivors and victims every day. *** President Barack Obama, Presidential Proclamation, September 30, 2015.

This case involves the greatest of domestic abuse, the senseless, brutal and vicious murder of a young mother of three following years of physical and emotional abuse at the hands of her husband, James Clay Waller, who as the evidence will show has a continued pattern of abusing women, especially domestic partners for decades. One could hardly imagine facts more compelling than those in the instant case calling for application of the charge of interstate domestic violence.

Moreover, Waller's prosecution would serve to bring justice for this horrific act and to protect the citizens from a dangerous, sociopathic and narcissistic murderer. Society as a whole will not be protected nor will any full measure of justice be reached without prosecution at the federal level.  Both, interests of the highest importance for any government.  Interests left substantially unvindicated.

### Prior Prosecution Left the Federal Interest Demonstrably Unvindicated

The Department presumes that a prior prosecution, regardless of result, has vindicated the relevant federal interest.  The presumption may be overcome when, as here, a conviction was achieved in a prior prosecution and the prior sentence was manifestly inadequate in light of the federal interest involved and a substantially enhanced sentence is available through the contemplated federal prosecution.  The federal interest is high and an effective sentence of 15 years is appallingly low for this outrageous crime, especially in light of a likely sentence of life imprisonment if convicted on federal charges.

The presumption may also be overcome, irrespective of the result in a prior state prosecution, in those rare cases where, as here, (1) the alleged violation involves a compelling federal interest; (2) the alleged violation involves egregious conduct, including that which

24

threatens or causes loss of life; and (3) the result in the prior prosecution was manifestly inadequate in light of the federal interest involved.  This exception also is met in the instant case.

### The Conduct Constitutes a Federal Offense and Admissible Evidence is Probably Sufficient to Sustain a Conviction

The third substantive prerequisite is that the Government must believe that the defendant's conduct constitutes a federal offense, and that the admissible evidence probably will be sufficient to obtain and sustain a conviction by an unbiased tryer of fact.  The same tests which is applied to all federal prosecutions.  *See* Principles of Federal Prosecution, USAM 9-27.200, et seq. The evidence against Waller is overwhelming and likely to result in his conviction.

### Procedural Prerequisite for Bringing a Prosecution Governed by the Petite Policy

The procedural process for obtaining a petite waiver is a thorough one; involving review and approval at many levels including the  AUSA responsible for the prosecution, the United State Attorney for the Eastern District of Missouri, an attorney with the Department of Justice Criminal Division, Office of Enforcement Operations, Policy and Statutory Enforcement Unit (OEO), the Supervising Attorney for OEO, the Director of OEO, and finally the number two attorney in the entire Department of Justice, the Deputy Attorney General.

The Deputy Attorney General of the United States issued her opinion that the federal prosecution of Clay Waller for Interstate Domestic Violence meets the Attorney General's criteria for dual prosecutions as set forth in USAM 9-2.03, that a substantial federal interest was left unvindicated, and permission was granted to proceed with the prosecution of James Clay Waller, II for interstate domestic violence in violation of 18 U.S.C. § 2261.

### II. PRETRIAL MOTIONS

25

### A. Motion to Dismiss Indictment on Grounds of Double Jeopardy and Violation of Due Process, Failure to State an Offense Against the United States

1.    **Double Jeopardy**

Waller's first claim is that his federal prosecution violates the double jeopardy clause of the Fifth Amendment to the United States Constitution.  Waller is incorrect.  He relies on the often claimed but never successful "*Bartkus* Exception," to the Dual Sovereignty Doctrine, which has never before resulted in the dismissal of an indictment in the history of the Eighth Circuit, and to the Government's knowledge, any circuit in the United States.  Waller's claim is insufficient to merit an evidentiary hearing on this exception to the dual sovereignty rule, and should be summarily denied.  Should an evidentiary hearing be held, it is the position of the Government that the defendant can present no evidence of collusion, much less a manipulative relationship, between the Cape Girardeau County Prosecuting Attorney's Office and the United States Attorney's Office concerning the filing of Waller's federal charges.  Each office acted independently in the discharge of their prosecutorial responsibilities.

**Dual Sovereign Doctrine**

The Dual Sovereignty Doctrine allows federal and state governments to bring successive prosecutions arising from the same criminal act. *Abbate v. United States*, 359 U.S. 187, 195-96 (1959). In order for this doctrine to apply, the two entities seeking to prosecute a defendant for the same criminal act must be separate sovereigns that derive their authority from distinct sources of power. *Heath v. Alabama*, 474 U.S. 82, 88 (1985). The individual States and the United States are separate sovereigns. *Id*. at 89. Even if the charges in the subsequent prosecution are identical to the charges in the first prosecution, the defendant's Fifth Amendment rights are not violated by the second prosecution: the Supreme Court "has plainly and repeatedly stated that

26

two identical offenses are *not* the 'same offense' within the meaning of the Double Jeopardy Clause if they are prosecuted by different sovereigns." *Id*. at 92 (emphasis in the original) (citing *United States v. Lanza,* 260 U.S. 377 (1922)).

The doctrine *may* have an exception: the Supreme Court has suggested in dicta that federal and state authorities may not manipulate a system to achieve the equivalent of a second federal prosecution. *See Bartkus v. Illinois,* 359 U.S. 121, 123–24 (1959).

### The *Bartkus* Exception

What has become the *Bartkus* exception, proposes that subsequent state prosecutions are unconstitutional when they act as "a sham and a cover for a federal prosecution, and [are] thereby in essential fact another federal prosecution." *Bartkus*, 359 U.S. at 124. This exception has been recognized in the Eighth Circuit. *See United States v. Basile*, 109 F.3d 1304, 1307 (8th Cir. 1997), *cert. denied*, *Basile v. United States*, 522 U.S. 873 (1997), *cert. denied*, *DeCaro v. United States*, 522 U.S. 866 (1997). The Eighth Circuit has been careful to note that it has never directly held that the *Bartkus* exception applies when as here, the federal prosecution is subsequent to the state prosecution, *see United States v. Leathers*, 354 F.3d 955, 960 (2004), *cert. denied*, 543 U.S. 844 (2004), but has assumed that it would apply for purposes of addressing cases involving a claim that a subsequent federal prosecution violated the Fifth Amendment double jeopardy clause. *See United States v. Williams*, 104 F.3d 213, 216 (8th Cir. 1997).

Even assuming that the exception does exist in the Eighth Circuit for subsequent federal prosecutions, the defendant would be required to prove that the federal prosecution was a sham or cover for the previous state prosecution. *See Leathers*, 354 F.3d at 960. In determining when a subsequent federal prosecution is a sham, the relevant inquiry is "*whether the state has*

27

'*effectively manipulated the actions of the federal government, so that the federal officials retained little or no independent volition.*'" *Id.* (emphasis added) (quoting *United States v. 38 Whalers Cove Drive,* 954 F.2d 29, 38 (2d Cir.), *cert. denied,* 506 U.S. 815 (1992). Mere cooperation between state and federal law enforcement authorities is not sufficient to trigger the exception. *United States v. Talley*, 16 F.3d 972, 974 (8th Cir. 1994) (noting that even in *Bartkus*, cooperation between law enforcement authorities was looked upon with approval). Evidence that "the federal government had an interest, independent of any state interest, to ensure that an individual who is believed to have violated a federal statute is prosecuted for that violation," tends to show that the *Bartkus* exception does not apply. *See Talley*, 16 F.3d at 974.  As will be discussed at length infra, the federal government has a compelling interest in protecting victims from physical harm at the hands of domestic partners in general, and a specific interest, that no woman will fall victim to this defendant again.

### Burden of Proof is on the Defendant

Every Circuit that has expressly identified the burden of proof for a sham prosecution claim has placed it on the defendant.[3]  Although the Eighth Circuit has not directly held that the

---

[3] *See U.S. v. Guzman*, 85 F.3d 823, 827 (1st Cir. 1996) (burden on defendant to present *prima facie* case that one sovereign "dominated" other, after which burden shifts to government to prove offenses were not identical); *U.S. v. Davis*, 906 F.2d 829, 834 (2d Cir. 1990) (burden on defendants to establish United States played role as "laboring oar" in conduct of state proceedings and federal prosecutors actively aided state prosecutors during local suppression hearing); *In re* Kunstler, 914 F.2d 505, 517 (4th Cir. 1990) (burden on defendant to establish that "[s]tate officials had little or no independent volition in their proceedings"); *U.S. v. Solis*, 299 F.3d 420, 435 (5th Cir. 2002) (burden on defendant to establish *prima facie* case of "collusion between federal and state law enforcement officials" in successive prosecutions); *U.S. v. Djoumessi*, 538 F.3d 547, 550 (6th Cir. 2008) (burden on defendant to show federal government "merely a tool" of state in subsequent prosecution); *U.S. v. Heidecke*, 900 F.2d 1155, 1160 (7th Cir. 1990) (burden on defendant  to make a "colorable showing"  that government prosecution was merely a sham); *U.S. v. Zone*, 403 F.3d 1101, 1107 (9th Cir. 2005) (burden on defendant to produce "evidence to show a *prima facie* double jeopardy claim" when alleging sham prosecution); *U.S. v. Raymer*, 941 F.2d 1031, 1037 (10th Cir. 1991) (burden on defendant to show "one sovereign is so dominated by the actions of the other that the former is not acting of its own volition"); *U.S. v. Baptista-Rodriguez*, 17 F.3d 1354, 1361 (11th Cir.) (burden on defendant to establish *prima facie* case that "one sovereign was so dominated, controlled, or manipulated by the actions of the other that it did not act of its own volition"); *U.S. v. Liddy*, 542 F.2d 76 (D.C. Cir. 1976) (burden on defendant to establish that "federal officials are controlling or manipulating . . . state processes").

burden of proof for a sham prosecution claim is on the defendant, it has provided language that is indicative of that stance. For example, in *United States v. Halls*, the court found that "Halls has failed to show an attempt to circumvent the strictures of the Double Jeopardy Clause by the multiple proceedings." 40 F.3d 275, 278 (8th Cir. 1994), *cert. denied*, 514 U.S. 1076 (1995). Again, in *Basile*, the court found that "DeCaro has not directed this Court to anything in the record that supports his claim of collusion between the two sovereigns." 109 F.3d 1304, 1307. Further, in *United States v. Garner*, the court found that "Garner has failed to show that the federal prosecution was a sham or cover for the state prosecution." 32 F.3d 1305, 1311 (8th Cir. 1994), *cert. denied*, 514 U.S. 1020 (1995). Finally, in *United States v. Vinson*, the court found that "Vinson has offered no evidence that the federal prosecution operated as a 'sham and a cover' to disguise a second prosecution in which the United States Attorney was a mere 'tool' of the State of Minnesota." 414 F.3d 924, 929 (8th Cir. 2005) (citing *Bartkus*, 359 U.S. at 123–24).

### Eighth Circuit Cases Discussing *Bartkus*

While neither the Supreme Court nor the Eighth Circuit has handed down a comprehensive analytical framework for determining when the *Bartkus* exception could apply, the Eighth Circuit has produced several examples of when the exception does not apply.  The *Bartkus* standard is indeed a demanding one.  As noted, there are no cases to illustrate when the *Bartkus* exception has been met because *the Eighth Circuit has never dismissed a prosecution, federal or state, based on this potential exception to the Dual Sovereignty Rule*.

In *United States v. Leathers*, 354 F.3d 995 (8th Cir. 2004), the defendant was charged in state court with the state offenses of assault in the first degree and armed criminal action. Due to

an internal conflict of interest in the prosecutor's office, the case was brought by John Quinn, a

private attorney, who received an appointment as a special prosecutor. *Id.* at 958. Leathers was

originally represented by Catherine Connelly, but she withdrew due to irreconcilable differences

with Leathers. *Id.* Connelly later accepted a position at the United States Attorney's office. *Id.*

Leathers was represented by a public defender at his state trial and was convicted of assault in

the second degree and armed criminal action. *Id.* at 958-59. After receiving the jury's verdict, the

trial judge set bail at $7,500 pending sentencing. *Id.* at 959. Quinn was unhappy with this

amount, and conveyed to the court that he would refer the case to the United States Attorney's

Office for a potential federal prosecution. *Id.* When he did refer the case to federal prosecutors,

he estimated that Leathers would receive a sentence of only two and a half years. *Id.* at 961.

Leathers was actually sentenced to ten years in prison on the state charges. *Id.* Shortly thereafter,

federal prosecutors charged Leathers with one count of being a felon in possession of a firearm

and one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g).

*Id.* at 959. Leathers received sentences of 327 months imprisonment on both counts to run

concurrently. *Id.* Connelly's United States Attorney's Office did not handle the federal

prosecution. *Id.* at 961. On appeal to the Eighth Circuit, Leathers argued, *inter alia*, that his case

qualified for the *Bartkus* exception for three reasons. *Id.* at 960. First, he argued that the federal

prosecution was a sham for another state prosecution because his case was referred to federal

prosecutors by the state prosecutor and would not have occurred but for the referral. *Id.* The

Court rejected that argument, stating:

> A referral made by a state prosecutor does not undermine the independence of federal
> prosecutors, regardless of the state prosecutor's motives in making the referral. The
> inquiry is not whether the prosecution would have taken place but for the referral, but
> rather whether the state has "effectively manipulated the actions of the federal
> government, so that the federal officials retained little or no independent volition."

*Id.* (quoting *38 Whalers Cove Drive*, 954 F.2d at 38). Second, Leathers argued that Quinn's low estimate of Leathers' state sentence incited the federal prosecutor to bring charges. *Id.* at 960-61. The Court rejected that argument, stressing that the important factor was the federal prosecutor's independent evaluation of the case as a candidate for prosecution. *Id.* at 961. Finally, Leathers argued that Connelly's new post in the United States Attorney's Office created a conflict of interest that diminished the independence of the federal prosecutor. *Id.* However, the Court pointed out that "[t]he *Bartkus* exception only applies when a sovereign improperly influences another sovereign." *Id.* Therefore, even if Connelly somehow influenced the federal prosecutors to bring charges, because she did not represent the State of Missouri in her previous role as a defense attorney, the *Bartkus* exception was not applicable. *Id.* Additionally, Connelly's office did not handle the federal prosecution. *Id.* The Court concluded that there was no double jeopardy. *Id.*

In *United States v. Basile*, 109 F.3d 1304 (8th Cir. 1997), defendants DeCaro and Basile were charged in state court with the execution-style murder of DeCaro's wife. *Id.* at 1306. Basile was tried as the hit man, was convicted, and sentenced to death. *Id.* DeCaro was acquitted of the murder charges in a separate trial. *Id.* A few months later, federal prosecutors charged DeCaro and Basile with use of the mail or facilities in interstate commerce with intent to commit murder-for-hire in violation of 18 U.S.C. § 1958, with conspiracy to commit murder-for-hire in violation of 18 U.S.C. §§ 1958 and 371, and with mail fraud in violation of 18 U.S.C. § 1341. A jury found DeCaro and Basile guilty of all charges, and both men were sentenced to life in prison. *Id.* On appeal to the Eighth Circuit, DeCaro argued, *inter alia*, that his Fifth Amendment rights were violated because he was subjected to double jeopardy in that the federal prosecution was a sham

for another state prosecution. *Id*. at 1307. In rejecting DeCaro's claim, the Court first noted that

*Bartkus* had never been extended in the Eighth Circuit to cover subsequent federal prosecutions,

although some panels of the Circuit had assumed that subsequent federal prosecutions would be

covered under the exception. *Id*. The Court then considered DeCaro's argument that, because the

federal prosecution came after a state acquittal, the prosecution was a sham. The Court replied

that "it would take far more than mere chronology of this sort to render the federal government a

'tool' of the state, or the federal prosecution 'a sham and a cover' for a *de facto* state

prosecution." *Id*. Finally, the Court considered DeCaro's argument that the subsequent federal

prosecution must have been a sham because the contract killing of his wife was of questionable

federal interest. *Id*. The Court responded that "[t]he independence and importance of the federal

interest in protecting the channels of interstate commerce from the taint of crime is unaffected by

DeCaro's previous acquittal in state court; it remains just as important and worthy of vindication

after the state trial as it was before." *Id*. The Court concluded that there was no double jeopardy

violation. *Id*.

   In *United States v. Williams*, 104 F.3d 213 (8th Cir. 1997), the defendant pled guilty to

distributing a controlled substance and unlawful use of a weapon in state court. *Id*. at 215. The

day after his plea in state court, Williams was indicted in federal court for being a felon in

possession of a firearm in violation of 18 U.S.C. § 922(g)(1), for knowingly and intentionally

distributing heroin in violation of 21 U.S.C. § 841(a)(1), and for carrying a firearm during and in

relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). *Id*. at 214. Williams, his

attorney, and the state court judge were all unaware of the impending federal indictment at the

time Williams pled guilty to the state charges. *Id*. at 215. The Assistant United States Attorney

prosecuting Williams federally had spoken to a state prosecutor concerning dismissing the state

charges, but was unaware that a different state prosecutor had arranged Williams' plea. *Id.*

Federal prosecutors subsequently used Williams' state court guilty plea to help secure his

conviction in federal court. On appeal to the Eighth Circuit, Williams argued, *inter alia*, that the

federal prosecution was a sham for a second state prosecution. The Court disagreed, stating that

while there was certainly miscommunication between the state and federal prosecutors, there was

no collusion. *Id.* at 216. The Court found that "although use of the state court guilty plea

undoubtedly helped obtain the federal conviction, there is no evidence federal authorities

deliberately procured the state plea or otherwise manipulated the state process for the purpose of

aiding the federal prosecution." *Id.*  The Court also noted that cooperation amongst prosecutors

did not amount to unlawful collusion in *Bartkus*. *Id.* The Court concluded that there was no

double jeopardy violation. *Id.*

In *United States v. Winters*, 491 F.3d 918, 920 (8th Cir. 2007), the defendant in that case

had previously been convicted in state court of the state offenses possession of

methamphetamine with intent to deliver, conspiracy to deliver, and failure to affix a tax stamp.

However, the Supreme Court of Iowa reversed Winters' convictions because his trial did not take

place within the ninety day speedy-trial window provided by Iowa Rule of Criminal Procedure

2.33(2)(*b*). *Id.* at 910. Winters' state court co-defendants waived their speedy-trial rights and

were convicted. *Winters*, 491, F.3d at 920. After this decision was handed down, federal

prosecutors charged Winters with conspiracy to distribute 50 grams or more of actual

methamphetamine in violation of 21 U.S.C. § 846, and possession with intent to distribute 50

grams or more of actual methamphetamine in violation of 21 U.S.C. § 841(a)(1) based on the

same evidence from the state proceedings. 2006 WL 6830512 (C.A.8) (Appellate Brief). The

District Court denied Winters' motion to dismiss, and on appeal he argued, *inter alia*, that his

federal prosecution was a sham for another state prosecution under the *Bartkus* exception because it was vindictive and selective in that his state court co-defendants were not also charged with federal offences, and that he was being punished for exercising his right to a speedy trial. *Winters*, 491 F.3d at 920. The Eighth Circuit flatly rejected Winters' arguments, saying it had already rejected the same arguments in *Leathers*, and that *Leathers* was controlling. *Id*.

In *United States v. Talley*, 16 F.3d 972 (8th Cir. 1994), the defendant was arrested after robbing a home with a gun. *Id*. at 973. He was released on bond pending trial. *Id*. While out on bond, he was suspected in another armed robbery. *Id*. Talley was arrested for this second robbery and put in jail, with his new bond set at $125,000. *Id*. Talley was convicted in a jury trial in state court of armed criminal action and robbery in the first degree. *Id*. His appeal bond was set at $100,000. *Id*. State prosecutors planned to dismiss the charges resulting from the second robbery, and were concerned that Talley would be released pending his appeal if he could post bond. *Id*. They voiced that concern to federal prosecutors, who subsequently charged Talley with felon in possession of a handgun in violation of 18 U.S.C. § 922(g). *Id*. Talley remained incarcerated until his federal trial, where a jury found him guilty of the offense charged. *Id*. On appeal to the Eighth Circuit, Talley argued, *inter alia*, that the federal prosecution was a sham for a second state prosecution in order to keep him incarcerated while his state appeal was pending. *Id*. at 974. In response, the Court first noted that state prosecutors could have used a Missouri Supreme Court Rule to keep Talley incarcerated while his state appeal was pending, so the federal prosecution was not a tool of the state to do something that the state could not do itself. *Id*. More importantly, however, the Court stated that "the federal government had an interest, independent of any state interest, to ensure that an individual who is believed to have violated a federal statute

34

is prosecuted for that violation." *Id*. The Court concluded that there was no double jeopardy violation. *Id*.

In *United States v. Johnson*, 169 F.3d 1092 (8th Cir. 1999), *cert. denied*, 528 U.S. 857 (1999), the defendant pled guilty in state court to the lesser charge of possession of a controlled substance after a search of his house revealed a significant amount of cash, cocaine, and marijuana. *Id*. at 1095. He received a sentence of two to four years in prison, but was released while his appeal was pending. *Id*. Several months later, Johnson was charged in federal court with conspiracy to distribute and possess with intent to distribute cocaine base (crack cocaine) in violation of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 2. *Id*. at 1094. Johnson's federal prosecution was brought by a county prosecutor who also served as a Special Assistant United State Attorney. *Id*. at 1095. Johnson was found guilty at his jury trial and was sentenced to life imprisonment. *Id*. at 1094. On appeal to the Eighth Circuit, Johnson argued, *inter alia*, that the federal prosecution was a sham for a second state prosecution. *Id*. at 1095. The Court disagreed, first noting that cooperation between law enforcement entities does not change the identity of the prosecuting sovereign. *Id*. at 1096. Next, the Court emphasized that "[t]he critical factor is whether or not the sovereign bringing the second prosecution was acting independently." *Id*. (citing *Bartkus*, 359 U.S. at 124). The Court then determined that there was no evidence to suggest the Special Assistant United States Attorney undermined the independence of either the state or federal prosecution. *Id*.

In *United States v. Garner*, 32 F.3d 1305 (8th Cir. 1994), *cert. denied*, 514 U.S. 1020 (1995), the defendant pled guilty to the reduced state charge of robbery in the second degree and received a sentence of two years imprisonment. *Id*. at 1307. At the time his state crimes were committed, a federal warrant had been issued for his arrest due to federal parole violations. *Id*.

After Garner was paroled in the state system after serving his term of imprisonment, he was handed over to federal authorities pursuant to the warrant, and charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(e). *Id*. Garner was found guilty at his federal trial and received the mandatory minimum sentence of 15 years imprisonment, due to his prior convictions. *Id*. at 1307-08. On appeal to the Eighth Circuit, Garner argued, *inter alia*, that the subsequent federal prosecution was a sham for a second state prosecution. *Id*. at 1310. The Court disagreed, first noting that both cases succeeded on their own merits. *Id*. at 1311. The Court went on to find that "the state, at most, simply cooperated with the federal authorities" and that such cooperation was approved of in *Bartkus*. *Id*. The Court concluded that there was no double jeopardy violation. *Id*.

   In *Chavez v. Weber*, 497 F.3d 796 (8th Cir. 2007), the defendant was arrested after a State Trooper pulled him over on a traffic stop and subsequently discovered 18.6 pounds of cocaine, 450.1 grams of methamphetamine, and over 4 pounds of marijuana in a concealed compartment in his vehicle. *Id*. at 799. At the scene Chavez made incriminating statements, such as the drug dog would probably detect drugs in his car. *Id*. Chavez was first prosecuted federally and charged with possession with intent to distribute five kilograms or more of cocaine and for possession with intent to distribute fifty grams or more of methamphetamine. *Id*. However, Chavez filed motions to suppress his incriminating statements and the evidence found in his car. *Id*. The magistrate judge, viewing only the Trooper's testimony and the patrol car dashboard video and audio feed, recommended that the motions be granted on the grounds that the Trooper did not have reasonable suspicion to extend the traffic stop. *Id*. The District Court followed that recommendation. *Id*. at 800. Federal prosecutors did not appeal the decision  and dropped the charges against Chavez. *Id*. Shortly thereafter, state prosecutors brought five drug charges

36

against Chavez in state court. *Id*. Chavez again filed motions to suppress his incriminating statements and the evidence found in his car. *Id*. However, the state produced more evidence at this suppression hearing than the federal government had at the previous hearing, and the trial judge denied the motions. *Id*. After a bench trial, Chavez was convicted of two counts of possession of a controlled substance with intent to distribute and one count of possession of marijuana. *Id*. The state Supreme Court ultimately upheld Chavez's conviction. *Id*. Chavez then filed for a writ of habeas corpus with the District Court, which was denied. *Id*. On appeal to the Eighth Circuit, Chavez argued, *inter alia*, that the subsequent state prosecution amounted to "an unconscionable breakdown in the underlying process." *Id*. at 802. The Court rejected this argument by stating that the default rule is that subsequent prosecutions by different sovereigns do not violate the Constitution, and that the *Bartkus* exception did not apply: just because the state presented a stronger case than the federal government does not mean there has been an unconscionable breakdown in the system when there was no evidence of collusion between state and federal prosecutors. *Id*.

In *United States v. Vinson*, 414 F.3d 924 (8th Cir. 2005), the defendant was charged in state court on charges relating to the discovery of 95.7 grams of cocaine base and a handgun in his home. *Id*. at 927. However, the state failed to bring the defendant to trial within the six month window provided by state law, so the charges were dismissed by the state court. *Id*. Federal prosecutors subsequently charged Vinson with possession with intent to distribute more than 50 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) to which he pled guilty. *Id*. On appeal to the Eighth Circuit, Vinson argued, *inter alia*, that his right to be protected from double jeopardy was violated by the subsequent federal prosecution. *Id*. at 928. However, the Court rejected this argument by stating that "Vinson has offered no evidence that the federal

37

prosecution operated as a 'sham and a cover' to disguise a second prosecution in which the United States Attorney was a mere 'tool' of the State of Minnesota." *Id*. at 929 (citing *Bartkus*, 359 U.S. at 123-24).

In *United States v. L.Z.*, 111 F.3d 78 (8th Cir. 1997), the defendant was a Native American who pled guilty to state charges arising out of a series of burglaries on a reservation. *Id*. at 79. However, this conviction was later overturned by the federal District Court, which found that the state did not have jurisdiction over the crime. *Id*. After this decision, federal prosecutors charged L.Z.  with two counts of third degree burglary on an Indian reservation in violation of 18 U.S.C. § 1153 (1994). *Id*. L.Z. pled guilty to those charges. *Id*. On appeal to the Eighth Circuit, L.Z. argued that his right to be free from double jeopardy was violated by the subsequent federal prosecution. *Id*. The Court rejected this argument, noting that there was no evidence that the state acted as a tool of the federal government when it prosecuted L.Z. for burglary, and that even though the state did not have jurisdiction over the crime, its efforts to prosecute were not a sham. *Id*. at 80.

In *United States v. Halls*, 40 F.3d 275 (8th Cir. 1994), *cert. denied*, 514 U.S. 1076 (1995), the defendant was arrested after a traffic stop and subsequent search revealed drug paraphernalia and a handgun. *Id*. at 276. Halls was a subject of a drug trafficking investigation, and federal and state officials were waiting to arrest him had he arrived at his intended destination. *Id*. Halls was charged with and pled guilty to state drug trafficking charges. *Id*. He also pled guilty to and was sentenced for the federal crime of conspiracy to distribute cocaine and methamphetamine in violation of 21 U.S.C. § 846. *Id*. On appeal to the Eighth Circuit, Halls argued, *inter alia*, that his right to be protected from double jeopardy was violated in that the federal prosecution was merely a sham for a second state prosecution. *Id*. at 277. The Court rejected that argument,

38

stating that "the federal and state authorities represented their own sovereign interests in their respective investigations and actions against Halls." *Id*. at 278. The Court added that "Halls [] failed to show an attempt to circumvent the strictures of the Double Jeopardy Clause by the multiple proceedings." *Id*.

In *United States v. Allen*, 16 F.3d 288 (8th Cir. 1994), the defendant was charged in state court with possession of marijuana with intent to distribute. *Id*. at 288. However, the trial judge granted Allen's motion to suppress the discovered marijuana, so the state referred the case to federal prosecutors and dismissed the charge. *Id*. Federal prosecutors charged Allen with possession with intent to distribute, and Allen pled guilty. *Id*. On appeal to the Eighth Circuit, Allen argued that because the state prosecutor referred the case to federal prosecutors instead of challenging the trial judge's ruling to suppress the evidence, the subsequent federal prosecution was merely a sham for another state prosecution. The Court rejected this argument, stating that "[s]ince the federal prosecution did not commence . . . until after the state prosecution had ceased, Allen's argument is meritless." *Id*.

In *United States v. Deitz*, 991 F.2d 443 (8th Cir. 1993), the defendant was charged in state court with crimes resulting from the discovery by state law enforcement officials of drugs, guns, and money in Deitz's home. *Id*. at 444-45. However, the state failed to bring Deitz to trial before the speedy-trial window expired, and the charges were dismissed with prejudice. *Id*. at 445. The state then referred the case to federal prosecutors, who subsequently filed charges against Deitz based on the same evidence obtained from the state prosecution. *Id*. Deitz was convicted by a jury of one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841 and one count of use of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). *Id*. at 444. On appeal to the Eighth Circuit,

39

Deitz argued, *inter alia*, that the subsequent federal prosecution violated his right to be free from double jeopardy because the federal prosecution was merely a sham or cover for another state prosecution due to the fact that the state drug charges had already been dismissed with prejudice. *Id*. at 445. The Court rejected this argument, stating that all Deitz had done was allege the federal prosecution was a backup to the state prosecution, and that he had not proven the prosecution was a sham. *Id*.

In *United States v. Moore*, 822 F.2d 35 (8th Cir. 1987), the defendant convinced two realtors that he was interested in buying a vacant home in Missouri. *Id*. at 36-37. After meeting the realtors at the home, Moore robbed them while using a gun, tied one up in the house, and kidnapped the other. *Id*. at 37. He was arrested a few weeks later in Minnesota. *Id*. Federal prosecutors in Missouri charged Moore with interstate transportation of a stolen vehicle, possession of a firearm by a convicted felon, and interstate kidnapping and using a firearm therein. *Id*. State prosecutors shortly thereafter charged Moore with kidnapping, robbery, and armed criminal action. *Id*. Moore pled guilty to federal charges and was sentenced. *Id*. While in federal prison, Moore was transported to Missouri state courts for appearances based on the state charges. *Id*. Moore then filed a motion to withdraw his federal guilty plea, but his motion was denied. *Id*. On appealing that denial to the Eighth Circuit, Moore argued, *inter alia*, that the federal government manipulated the state criminal justice system to achieve a second prosecution for the same criminal acts. *Id*. The Eighth Circuit rejected this argument, stating that "[t]he record here demonstrates nothing more than mere cooperation between the federal government and Missouri authorities, which cooperation the Court in *Bartkus* explicitly approved." *Id*. at 38 (citing *Bartkus*, 359 U.S. 121, 123).  Two other cases from the Eighth Circuit has mentioned the *Bartkus* exception. *See United States v. Quinn*, 95 F.3d 8 (8th Cir. 1996), and *United States v.*

40

*Bartlett*, 856 F.2d 1071 (8th Cir. 1988). However, both *Quinn* and *Bartlett* were decided on other grounds and do not analyze the applicability of the exception.

Even more examples of fact patterns that do not fall under the *Bartkus* exception are readily available from other Circuits.[4]

### Waller's Claim Falls Woefully Short of Meeting His Burden to Allege Sufficient Facts Entitling Him to an Evidentiary Hearing.

What extraordinary facts does Waller claim would compel a court to rule for the first time ever that the *Bartkus* exception should result in the dismissal of an indictment?

The statements Waller asserts should entitle him to a hearing on his double jeopardy claim are set out at the bottom of page 4 top of and page 5 of his Motion to Dismiss.  Waller first admits that there must be a showing of unlawful collusion between the state and federal officials involved.  (Mot. To Dismiss, Doc. 57 at 5)  It is important to note that Waller admits that the prosecutors involved did in fact retain their independence.  *Id*.  "Waller does not pretend the prosecutors involved did not retain their independence."  Doc. 57 at 5.  Likewise, he does not

---

[4] *See, e.g.*, *U.S. v. Coker*, 433 F.3d 39, 47 (1st Cir. 2005) (no sham prosecution because no evidence existed that federal officials and  state officials worked together in investigations); *U.S. v. Burden*, 600 F.3d 204, 228-29 (2d Cir. 2010) (no sham prosecution  because no evidence federal government acted as "tool" of state government); *U.S. v. Berry*, 164 F.3d 844, 847 (3d Cir. 1999) (no sham prosecution because state investigation was not controlled by federal government and valid federal interests justified federal prosecution); *U.S. v Montgomery*, 262 F.3d 233, 238 (4th Cir. 2001) (no sham prosecution because "state prosecutor was independent from the federal prosecutor, did not purport to represent the federal sovereign, was not funded by the federal sovereign, and vindicated the separate interests of the state sovereign in prosecuting"); *U.S. v. Moore*, 370 Fed.Appx. 559, 561 (5th Cir. 2010) (no sham prosecution because no evidence of manipulation or lost volition); *U.S. v. Mardis*, 600 F.3d 693, 697 (6th Cir. 2010) (no sham prosecution because "there [was] no evidence that the prosecutions were not conducted separately"); *U.S. v. Algee*, 309 F.3d 1011, 1015 (7th Cir. 2002) (same prosecutor handling both state and federal cases does not establish that prosecution was a sham); *U.S. v. Zone*, 403 F.3d 1101, 1105 (9th Cir. 2005) (no sham prosecution because federal and state prosecutors collaborated "as equal, independent partners" in gun violence task force); *U.S. v. Barrett*, 496 F.3d 1079, 1119 (10th Cir. 2007) (no sham prosecution because no evidence of collusion between state and federal authorities, no indication that federal government played significant role in earlier state prosecution, and no evidence that Oklahoma instigated or guided federal prosecution); *U.S. v. Baptista-Rodriguez*, 17 F.3d 1354, 1361-62 (11th Cir. 1994) (no sham prosecution even though United States officials conducted all aspects of the investigation because the decision to prosecute was independent and volitional); *U.S. v. Carson*, 455 F.3d 336, 381 (D.C. Cir. 2006) (no sham prosecution because no evidence that state authorities directing grand jury testimony were controlled or even used by federal authorities).

claim that any cooperation between federal and state authorities in the investigation was improper. "Nor does Waller argue that routine cooperation between them was tantamount to some prosecutorial impropriety in violation of his constitutional rights." *Id*. What he does assert, is not by way of a statement of facts, but the mere suggestion of a collusion. However, Waller "suggests" that there did exist some inappropriate collusion to first induce Waller into cooperating, and then forge a pathway for federal prosecution following discovery of the book. *Id*.

Waller makes several conclusory statements but does not allege one single fact showing improper collusion between the state and federal governments. This Court specifically warned the defendant of the essential need to set forth specific factual details to support a motion to suppress and advised the defendant that failure to do so would result in the denial of an evidentiary hearing.

This Court's May 24, 2016 order provides, "any motion to suppress shall set forth, with particularity, the item(s)of evidence to which the motion is addressed, and shall set forth specific factual details to support any claim that such evidence was unlawfully obtained. **Any motion to suppress not containing such specific information or any motion cast in conclusory or conjectural terms will not be heard or considered by the Court.**" [Doc. 12, p. 2].

In direct disregard of this Court's order, Waller fails to set forth specific factual details from which the Court could possibly find the instant prosecution violates the Double Jeopardy Clause of the Fifth Amendment. While this is understandable, for there was no improper collusion between the state and federal government hence no available facts to support such a claim, it is nevertheless fatal. Waller's motion to dismiss the indictment on grounds of Double Jeopardy should be considered and denied without the need of an evidentiary hearing.

2. **Selective Prosecution**

Waller next contends he is the victim of selective prosecution and for that reason his indictment should be dismissed. Again, Waller's pleadings fall far short of meeting the threshold showing necessary to even entitle him to a hearing, much less entitle him to relief on the basis of selective prosecution.

**The Government is Granted Broad Discretion in Its Charging Decisions and in the Absence of Clear Evidence to the Contrary the Court Presumes This Official Duty Has Been Properly Discharged.**

A review of Waller's claim must begin with an appreciation of the broad discretion offered to the Government in exercising its charging powers. A prosecutor has broad discretion in initiating a criminal case, and, unless deliberately based on improper considerations, the exercise of that discretion is generally not subject to judicial review. The doctrine of prosecutorial discretion is a cardinal feature of our system of criminal justice "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248 (1980); *United States v. Batchelder*, 442 U.S. 114, 124 (1979).

The "broad discretion" exercised by prosecutors derives from the basic structure and operation of the tripartite system of federal government. Pursuant to Article II of the Constitution, "[t]he executive Power ***[is] vested in ***[the] President of the United States" (§ 1, Cl. 1), who is charged to "take Care that the Laws be faithfully executed" (§ 3). One of the principal powers of the Executive is to bring criminal proceedings "in the name of the United States as sovereign." *United States v. Nixon*, 418 U.S. 683, 694 (1974); *see also United States v.*

43

*Russell*, 411 U.S. 423, 435 (1973).  In the exercise of this power "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."  *Nixon*, 418 U.S. at 693.  And of course the Attorney General, acting either directly or through subordinate officials in the Department of Justice, "is the hand of the President in taking care that the laws of the United States ***in the prosecution of offenses be faithfully executed."  *Ponzi v. Fessenden*, 258 U.S. 254, 262 (1922); *see also Nixon*, 418 U.S. at 694; *United States v. Johnson*, 323 U.S. 273, 278 (1944); 28 U.S.C. 509, 510, 515, 516, 533.  The doctrine of prosecutorial discretion rests on this fundamental authority reserved to the Executive under the principle of separation of powers and serves to ensure that the judiciary does not impermissibly intrude upon functions entrusted to the co-equal branch of government responsible for law enforcement.

In addition, the practical implementation of this executive responsibility makes it largely inappropriate and unsuited to judicial oversight.  Indeed, as Chief Justice (then Judge) Burger has observed, "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings ***."  *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967).  As recognized by the Eighth Circuit, the Government retains broad discretion in determining whom to prosecute, and "the decision to prosecute is particularly ill-suited to judicial review."  *United States v. Ojala*, 544 F.2d 940, 943 (8th Cir. 1976)*, citing Wayte v. United States*, 470 U.S. 357, 607 (1985).

For these reasons, the prosecutor is vested with "broad discretion" that is not generally subject to judicial review.  *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982).  And, because such discretion is an integral part of the criminal justice system, "the conscious exercise of some selectivity in enforcement is not itself a federal constitutional violation."  *Ibid*., *quoting Bordenkircher v. Hayes*, 434 U.S. at 364, and *Oyler v. Boles*, 368 U.S. 448, 456 (1962).

"[P]rosecutor[s are] duty bound to exercise [their] best judgment ***in deciding which suits to bring" (*Imbler v. Pachtman*, 424 U.S. 409, 424 (1976)), and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926); *see also United States v. Dotterweich*, 320 U.S. 277, 285 (1943); *Gregg v. Georgia*, 428 U.S. 153, 225 (1976); *Cameron v. Johnson*, 390 U.S. 611, 623 (1968).  As stated in *United States Christian*, 2017 WL 2437295 (W.D.AR., March 3, 2017), a presumption exists that a prosecution for violation of a criminal law is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice.  *Christian*, at *6, *citing United States v. Ojala*, 544 F.2d 940, 943 (8th Cir. 1976).

To be sure, "[s]electivity in the enforcement of criminal law is ***subject to constitutional constraints."  *Batchelder*, 442 U.S. at 125; *see also Two Guys v. McGinley*, 366 U.S. 582, 588 (1961).  As the Supreme Court has held, "[t]he Equal Protection Clause prohibits selective enforcement" (*Batchelder*, 442 U.S. at 125 n.9) against a defendant whose selection from among others similarly situated "was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."  *Oyler v. Boles*, 368 U.S. at 456; *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373-374 (1996).

### Burden of Proof is on the Defendant.

The defendant bears the burden of proof on a claim of selective prosecution.  *United States v. Huff*, 959 F.2d 731, 735 (8th Cir. 1992), *cert. denied*, 506 U.S. 855 (1992).  The defendant bears the burden of proving both a discriminatory purpose and discriminatory effect.  *United States v. Peterson*, 652 F.3d 979, 981 (8th Cir. 2011); *United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004).  The evidentiary burden is a heavy one.  *United States v. Leathers*, 354

45

F.3d 955, 961 (8th Cir. 2004), and the burden "falls heavily on the defendant." *United States v. Wilson*, 806 F.2d 171, 176 (8th Cir, 1986); *United States v. Armstrong*, 517 U.S. 456, 465 (1996).

Not only is the burden of proof on the defendant, but as noted, there is a presumption "that a prosecution for a violation of criminal law is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice." *United States v. Christian*, 2017 WL 2437295 at *6 (W.D. AR., March 3, 2017), quoting *United States v. Ojala*, 544 F.2d 940, 943 (8th Cir. 1976).

### In Order to Prevail on a Claim of Selective Prosecution, the Defendant Must Prove That: (1) People Similarly Situated Were Not Prosecuted and (2) the Decision to Prosecute Was Motivated By a Discriminatory Purpose.

A selective prosecution claim requires the defendant to prove that: (1) people similarly situated were not prosecuted; and (2) the decision to prosecute was motivated by a discriminatory purpose. *United States v. Peterson*, 652 F.3d 979, 981 (8th Cir. 2011); *United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004). To establish the essential elements of a prima facie case of selective prosecution, a defendant must first demonstrate that he [or she] has been singled out for prosecution while others similarly situated have not been prosecuted for conduct similar to that for which he [or she] was prosecuted. Second, the defendant must demonstrate that the government's discriminatory selection of him [or her] for prosecution was based upon an impermissible ground, such as race, religion or [the] exercise of [the] first amendment right to free speech. *United States v. Catlett*, 584 F.2d 864, 866 (8th Cir. 1978). The Eighth Circuit en banc affirmed this two-part test for selective prosecution in *United States v. Eklund*, 733 F.2d 1287, 1289-91 (8th Cir. 1984) (banc), *cert. denied*, -- U.S. --, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985).

46

Defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.  *United States v. Venable*, 666 F.3d 893, 900-01 (4th Cir. 2012); *United States v. Ponce*, 2015 WL 7302225 at 2 (D.Neb.,  Nov. 18, 2015); *United States v. Holthausen*, 2013 WL 5913843 at 12 (D.Minn., Oct. 31, 2013).  For the purposes of a selective prosecution claim, the term "similarly situated" means that a person is "engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant," where the "prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan," and where "the evidence was as strong or stronger than that against the defendant."  *United States v. Vawter*, 2014 WL 5438382 (W.D.MO., Oct. 24, 2014) at *8 (citing *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000)).

### The Defendant Must First Make a Threshold Showing of the Essential Elements of Selective Prosecution Before an Evidentiary Hearing is to Be Held.

The mere allegation of selective prosecution does not require an evidentiary hearing. *United States v. Jacob*, 781 F.2d 643, 646 (8th Cir. 1986).  Conclusory assertions of discriminatory motive, without supporting facts, are "wholly insufficient to support a claim of selective prosecution."  *United States v. Christian*, 2017 WL 2437295 *6 (W.D. Ark., March 3, 2017), *citing United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004).

The defendant must first make a preliminary or threshold showing of the essential elements of the selective prosecution defense.  *United States v. Catlett*, 584 F.2d 864, 865 (8th Cir. 1978).  "A hearing is necessitated only when the motion alleges sufficient facts [in support of the selective prosecution claim] to take the question past the frivolous state and raises a

reasonable doubt as to the prosecutor's purpose.  *United States v. Jacob*, 781 F.2d 643, 647 (8th

Cir. 1986), *citing United States v. Catlett*, 584 F.2d at 866.

### Waller Has Unquestionably Failed to Meet His Burden of Proof Entitling Him to an Evidentiary Hearing and His Motion to Dismiss the Indictment Based on Selective Prosecution Must be Summarily Denied.

Waller's singular piece of evidence offered to prove the first prong of selective

prosecution, that Waller was singled out for prosecution where "other similarly situated

defendants" "engaged in similar conduct" were not prosecuted, is to claim "the Government has

not previously filed federal charges against an individual convicted first at a state level for

alleged publication of a murder tell-all."  "That alone," Waller argues, "is sufficient to support a

finding that he was singled out."  (Motion to Dismiss, Doc. 57, at 16)

Waller's argument misses the mark entirely.  It is a non-sequitur.  Even if it is true that

Waller is the only defendant the federal government has prosecuted who committed a crime

under these circumstances, such fact is meaningless on a selective prosecution claim, unless it is

also shown that there are other similarly situated defendants who engaged in similar conduct,

that were not prosecuted.  This is the essence of selective prosecution; that this defendant is

treated differently than other similarly situated defendants.  At best, Waller's assertion shows

only that his crime is unique in nature and that there are no other similarly situated defendants

who were not prosecuted.  This is of course fatal to a selective prosecution claim.

Waller identifies not one similarly situated defendant.  Furthermore, there are no facts

alleged in Waller's motion from which this Court could find there are other similarly situated

defendants that were not prosecuted.  None.  This total factual absence makes it impossible for

the Court to find that sufficient facts have been pled to entitle Waller to an evidentiary hearing

on his selective prosecution claim.  Waller's allegations on the first prong of selective

prosecution is not just insufficient, it is non-existent.  This is understandable, because the facts of Waller's crime are as unique as they are compelling.

Because there is no evidence whatsoever to support the first element of selective prosecution, Waller's claim fails without need to review the second element of his defense.  *See United States v. Leathers*, 354 F.3d 955, 963 (8th Cir. 2004); ("Because Leathers fails the first part of the [selective prosecution] test, and both parts of the test must be satisfied if a defendant is to prevail on a claim of selective prosecution, we need not discuss the second part of the test.") The Government therefore will not address Waller's claim that the Government's motive in prosecuting this horrendous murder, allegedly committed by Missouri's most notorious wife killer, was solely to punish him for writing a book, a book he does not even admit to authoring.[5] The Government's argument concerning the lack of a constitutionally impermissible motive will be addressed in Waller's claim of vindictive prosecution, but applies equally with regard to the second element of selective prosecution were it to be addressed.

Where the defendant fails to satisfy the demanding burden of proving the two elements of prima facie case of selective prosecution his claim of selective prosecution should be summarily dismissed.  *United States v. Catlett*, 584 F.2d 864 (8th Cir. 1978).  *See United States v. Christian,* 2017 WL 2437295 (W.D.AR., March 3, 2017); *United States v. Jacobs*, 781 F.2d 643 (8th Cir. 1986); and *United States v. Heying*, 2014 WL 5286155 (D.Minn., Oct. 15, 2014), all cases summarily dismissing such insufficient claims.

Without these showings, it is presumed that the Government prosecuted the case in good faith and in a nondiscriminatory way pursuant to its duty to bring offenders to justice.  *United*

_____

[5] "The book apparently generated by Waller wasn't actually generated by Waller."  (Motion to Dismiss, Doc. 57, at 15).

*States v. Welliver*, 976 F.2d 1148 (8th Cir. 1992). That is exactly what the Government seeks to do in Waller's case, to bring him to justice for the horrendous murder he has committed.

Waller has failed to meet his burden entitling him to an evidentiary hearing. Accordingly, his claim of selective prosecution should be summarily dismissed.

**3.      Vindictive Prosecution**

Waller next asserts a claim of vindictive prosecution. A criminal defendant's due process rights may be violated where a prosecutor, motivated by vindictiveness, prosecutes a defendant on federal charges after the defendant exercised a legal right in state court. *United States v. Beede*, 974 F.2d 948, 951 (8th Cir. 1992), *cert. denied*, 506 U.S. 1067 (1993). Vindictive prosecution occurs when a prosecutor seeks to punish a defendant solely for exercising a valid legal right. *United States v. Leathers*, 354 F.3d 995, 961 (8th Cir. 2004); *United States v. Williams*, 793 F.3d 957 (8th Cir. 2015); *United States v. Campbell*, 410 F.3d 456, 462 (8th Cir. 2005). It is the defendant's burden to show that the prosecution was brought in order to punish the defendant for the exercise of a legal right. *United States v. Williams,* 793 F.3d at 963. The defendant must show that the prosecutor (1) harbored genuine animosity toward the defendant or was prevailed upon to bring the charges by another with animosity such that the prosecutor could be considered a "stalking horse," and (2) the defendant would not have been prosecuted except for the animosity toward the defendant for exercising a legal right. *United States v. Von*, 2007 WL 3313450 at 3 (D.Minn., Nov. 6, 2007), *citing United States v. Sanders*, 211 F.3d 711, 717 (2nd Cir. 2000). In alleging vindictive prosecution, defendants carry a heavy evidentiary burden because of the broad discretion of prosecutors. *Campbell,* 410 F.3d at 462, *citing Leathers*, 354 F.3d at 961. Instead, a presumption of regularity attaches to prosecutorial decisions "in the absence of clear evidence to the contrary" because courts presume that prosecutors have properly

50

discharged their official duties.  *United States v. Chappell*, 779 F.3d 872 at 880; *United States v. Hill*, 2016 W.L. 8674241 at 4 (ED Mo., 2016).

To prevail on a vindictive prosecution claim, the defendant must show "bad faith or maliciousness" on the part of the prosecutor.  *United States v. Scott*, 610 F.3d 1009, 1017 (8th Cir. 2010).  *United States v. Von*, 2007 W.L. 3313450 (D.Minn., Nov. 6, 2007); (citing, *United States v. Sanders*, 211 F.3d 711, 717 (2nd Cir. 2000)). The bar the defense must reach is indeed extraordinarily high.  As the defendant has acknowledged, the Eighth Circuit has yet to see a set of circumstances so egregious as to satisfy the requirements necessary to prevail on such a claim. (Mot. To Dismiss, Doc. 57, at 14)

Only if the defendant provides sufficient evidence to take the question of vindictive prosecution past a frivolous state and raise reasonable doubt as to the prosecutor's purpose, must the court hold an evidentiary hearing on the issue.  *United States v. Kelley*, 152 F.3d 881, 885 (8th Cir. 1998); and *United States v. Clay*, 2006 W.L. 2265254 (E.Ark., Aug. 7, 2006).

### Waller Has Failed to Meet His Burden of Proof Entitling Him To An Evidentiary Hearing on His Motion to Dismiss For Vindictive Prosecution.

Waller, once again, has not alleged sufficient facts to entitle him to an evidentiary hearing on the issue of vindictive prosecution.  His motion fails in several respects.

First, Waller does not even assert, much less offer proof, that he exercised the constitutional right, for which he claims the Government retaliated.  To the contrary, Waller denies generating the book.  "The book apparently generated by Waller wasn't actually generated by Waller, but via an author from the Baton Rouge, La. area."  Motion to Dismiss, Doc. 57 at 15.  Waller cannot have it both ways.  He cannot claim he did not author the manuscript yet at the same time argue that his case should be dismissed because the prosecution

was solely an effort to punish him for authoring the book.   Waller simply cannot make a submissable claim of vindictive prosecution by alleging the prosecution was in retaliation for the writing of a book, the claimed exercising of free speech, by another person.  As asserted, Waller did not exercise his free speech under the First Amendment, the "author" from Louisiana did, according to his pleadings.  For this reason alone, Waller's claim should be dismissed without an evidentiary hearing.

Secondly, as Waller admits in his brief, no court has ever held that a claim of vindictive prosecution can be made upon a claim that the Government's motive was to retaliate for exercising the First Amendment right of freedom of speech.  Most significantly, where that speech is the confession to a crime.  The Government contends that speech that is a confession to a crime, be it an oral confession, a handwritten confession, or a written confession in the form of a book, is not the type of constitutional right that can serve as the basis for a claim of prosecutorial vindictiveness.  The vindictive prosecution has had its origin in claims of procedural retaliation for actions that have occurred in the prosecution of a criminal case, such as the filing of additional charges following a remand on appeal.  Extending this doctrine to a confession would have absurd results.  Any individual who makes a public confession to a crime, which then served as a critical factor in his prosecution would be entitled to a dismissal of the indictment for prosecutorial vindictiveness.

In *Wayte v. United States*, 105 S.Ct. 1524, 470 U.S. 598 (1985), the United States Supreme Court addressed a very similar argument in the context of a selective prosecution claim.  Wayte failed to register for the Selective Service.  Instead of registering, he wrote letters to government officials, including the President, admitting that he had not registered and did not intend to do so.  Subsequently, the Selective Service adopted a policy of passive enforcement

under which it would investigate and prosecute only certain nonregistration cases that included

those who, like Wayte, made such admissions.  Wayte claimed he had been impermissibly

targeted for prosecution based on the exercise of his First Amendment rights.  After dismissing

Wayte's claim for various other reasons, the Supreme Court addressed the logical conclusion that

would emanate from allowing such a claim to prevail, saying "We think it important to note as a

final matter how far the implications of petitioner's first amendment argument would extend."

The Court noted that Wayte's argument amounted to self reporting.  Under Wayte's view, then,

the Court noted, "The Government could not constitutionally prosecute a self reporter -- …

unless perhaps it could prove that it would have prosecuted him without the letter."  On

principle, noted the Court, "Such a view would allow any criminal to obtain immunity from

prosecution simply by reporting himself and claiming that he did so in order to protest the law.

The first amendment confers no such immunity from prosecution."  *Wayte*, at 614.  The same

unreasonable  result would follow if those who publicly confess to the commission of crimes

were allowed to make a claim of vindictive prosecution based upon a violation of their first

amendment rights.

Next, addressed on the merits, the essence of Waller's claim is the fact the prosecution

followed discovery of the manuscript entitles the Court to presume the decision to prosecute was

made solely to retaliate against Waller for his role with regard to the contents of the book.  This

is incorrect.  Such arguments have been rejected by the Eighth Circuit.  In *United State v.*

*Williams*, 793 F.3d 957 (8th Cir. 2015), the Court of Appeals noted that Williams' primary

argument was that the timing of the superseding indictment demonstrates vindictiveness, "but

timing alone is insufficient to trigger the presumption of vindictiveness."  *United States v.*

*Williams*, 793 F.3d at 963.  "Indeed, a presumption does not arise just because action detrimental to the defendant was taken after the exercise of the defendant's legal rights."  *Id*.

Finally, should an evidentiary hearing be held the Government will introduce testimony the decision to seek the filing of federal charges was made long before the discovery of the manuscript.  The manuscript was discovered during the course of a final round of interviews of former federal cellmates of Waller's at the conclusion of the Government's investigative efforts, prior to submitting its request for permission to seek an indictment charging Waller with interstate domestic terrorism.

The Government's evidence will be that the charge against Waller was motivated not by a malicious intent for allegedly exercising his First Amendment exercise of free speech, but in recognition of many factors to include, the seriousness of the offense committed, the federal interest in prevention of interstate domestic violence, the need to protect others from future harm, Waller's extensive history of domestic violence, inadequacy of the sentence in light of the severity of the crime committed, and the fact the state disposition left a substantial federal interest unvindicated.

**4.     Failure to State an Offense Against the United States**

Waller moves to dismiss the indictment for failure to state an offense or in the alternative for a bill of particulars.  Waller is entitled to neither.  An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed.R.Crim.P. 7(c).  The test of the sufficiency of an indictment "is whether it contains the elements of the offense charged, and sufficiently apprises the defendant of what he must be prepared to meet, and in case any other proceedings are taken against him for a similar offense,

whether the records shows with accuracy to what extent he may plead a former acquittal or conviction." *United States v. Debrow*, 346 U.S. 374, 376, 74 S.Ct. 113 (1953).

An indictment adequately states an offense if:  "It contains all the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow defendant to plead a conviction or acquittal as a bar to a subsequent prosecution. An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense to which the defendant was convicted." *United States v. Hernandez*, 299 F.3d 984, 992 (8th Cir. 2002) (quoting *United States v. Fleming*, 8 F.3d 1264, 1265 (8th Cir. 1993).  An indictment is normally sufficient if its language tracts the statutory language. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Sewell*, 513 F.3d 820 (8th Cir. 2008); *United States v. Tebau*, 713 F.3d 955, 962 (8th Cir. 2013).

The elements for establishing a violation of 18 U.S.C. § 2261 are:  (1) the defendant traveled in interstate commerce (2) with the intent to kill, injure, harass or intimidate a spouse, intimate partner or dating partner and; (3) as a result of such travel commits or attempts to commit a crime of violence against the spouse, intimate partner or dating partner.

The Government's indictment tracks the language of the statute and includes all the elements of the offense.  It also fairly informs him of the charge against him and is sufficient to enable him to plead double jeopardy in the event of further prosecution.  Accordingly, the indictment is proper.

In the alternative, Waller seeks a Bill of Particulars requesting no specific identifiable disclosures.  A bill of particulars is a "formal, detailed statement of the claims or charges brought by a plaintiff or prosecutor." *United States v. Belfrog*, 2016 WL 1301085 at 2 (D.Minn., April 1,

2016), *citing United States v. Urban*, 404 F.3d 754, 771 (3rd Cir. 2005) (quoting Black's Law

Dictionary 177 (8th ed. 2004)).  "The purpose of a bill of particulars is to inform the defendant of

the nature of a charge with 'sufficient precision to enable him to prepare for trial' and 'to avoid

or minimize the danger of surprise at trial.'"  *United States v. Livingstone*, 576 F.3d 881, 883 (8th

Cir. 2009).  However, a bill of particulars is not a tool for discovery and "is not to be used to

provide detailed disclosure of the government's evidence at trial."  *United States v. Wessels*, 12

F.3d 746, 750 (8th Cir. 1993).

The Eighth Circuit has stated that the decision to order a bill of particulars is left to the

broad discretion of the trial court.  *United States v. Maull*, 806 F.2d 1340, 1345 (8th Cir. 1986).

"So long as the defendant was adequately informed of the charges against him and was not

unfairly surprised at trial as a consequence of the denial of the bill of particulars, the trial court

has not abused its discretion."  *Id.*, at 1345-46.  Accordingly, at the pre-trial stage, courts

considering whether to grant a motion for a bill of particulars ask whether the defendant has been

adequately informed of the charges such that he can prepare a defense and avoid surprise at trial.

*See United States v. Cree*, No. 12-26, 2012 WL 6194395, at *6 (D.Minn., Dec. 12, 2012); *United

States v. Belfrog*, 2016 WL 1301085 at 2 (D.Minn., April 1, 2016).  The pleadings in this case

adequately inform Waller of the charges and permits him to both prepare a defense and avoid

surprise at trial.  Accordingly, his motion for a bill of particulars should be denied.

**5.      Motion to Suppress Statements and Evidence**

Waller seeks to suppress various statements made to federal and/or state law enforcement

agents as well as statements made in open court. Waller contends that these statements were

involuntary, made without advice of rights, and were extracted by coercive means. Further,

56

Waller argues that evidence obtained because of these statements is subject to the exclusionary rule, as they are fruits of the poisonous tree.

For the reasons stated below, none of the statements at issue was taken in violation of Waller's constitutional rights, and therefore these statements are not subject to suppression. Accordingly, as there was no violation, any evidence derived from these statements is properly admissible.

### July 11-13, 2011 – Interviews at FBI, Cape Girardeau

Waller claims that the statements made on July 11-13, 2011 were involuntary because he was not brought timely before a judge, the length and nature of his "custody" and the duration of his interrogation were inherently coercive and he was subject to duress and coercion based on threats and/or promises of leniency. Further, Waller claims that his statements were made without the benefit of *Miranda* warnings. The evidence at the hearing (consistent with the facts set forth above) will show that Waller's July 11 and 13 statements were entirely voluntary, not the product of coercion or duress.  Moreover, no *Miranda* warnings were required because Waller was not in custody.

*Waller Was Not In Custody and Therefore* Miranda *Rights Were Not Required*

The test for whether a defendant is in "custody" for purposes of triggering an obligation to give *Miranda* rights is as follows:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Yarborough v. Alvarado*, 541 U.S. 652 (2004).

The Eighth Circuit considers six nonexclusive factors when determining whether a suspect is in

custody:

> (1) whether the suspect was informed at the time of questioning that the
> questioning was voluntary, that the suspect was free to leave or request the
> officers to do so, or that the suspect was not considered under arrest; (2) whether
> the suspect possessed unrestrained freedom of movement during questioning; (3)
> whether the suspect initiated contact with authorities or voluntarily acquiesced to
> official requests to respond to questions; (4) whether strong arm tactics or
> deceptive stratagems were employed during questioning; (5) whether the
> atmosphere of the questioning was police dominated; or, (6) whether the suspect
> was placed under arrest at the termination of the questioning.

*United States v. Zavesky*, 839 F.3d 688, 696 (8th Cir. 2016) (quoting *United States v. Griffin*, 922

F.2d 1343, 1349 (8th Cir. 1990)). Here, the evidence will show that all of the factors demonstrate

that Waller was not in custody when he made these statements and therefore, no *Miranda*

warnings were required.  Here, SA Ritter explicitly told Waller that he was not under arrest and

was free to leave at any time. *See United States v. New,* 491 F.3d 369, 373–74 (8th Cir.2007)

("The most obvious and effective means of demonstrating that a suspect has not been taken into

custody is for police to inform the suspect that an arrest is not being made and that the suspect

may terminate the interview at will." (quotation and alterations omitted)); *United States v. Ollie,*

442 F.3d 1135, 1138 (8th Cir.2006) ("[A]n explicit assertion that the person may end the

encounter ... generally removes any custodial trappings from the questioning.").

Further, the fact that these interviews occurred at a law enforcement office does not alter

the conclusion that Waller was not in custody.

> A noncustodial situation is not converted to one in which *Miranda* applies simply
> because a reviewing court concludes that, even in the absence of any formal arrest
> or restraint on freedom of movement, the questioning took place in a "coercive
> environment." Any interview of one suspected of a crime by a police officer will
> have coercive aspects to it, simply by virtue of the fact that the police officer is

> part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *see also California v. Beheler*, 463 U.S. 1121 (1983) (holding no *Miranda* warnings are required where defendant voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview). Neither the temporal relationship to the crime, nor the amount of evidence that the police have, are relevant to that inquiry. *Beheler*, 463 U.S. at 1125.

*No Prompt Presentment to a Judge Was Required Because Waller Was Not Arrested*

Waller further complains that he was not presented before a judge "as soon as practicable," and a lawyer was not afforded him prior to this interrogation.  The United States Supreme Court recognizes that a delay in presenting an *arrestee* to a magistrate judge for arraignment can preclude the admission of a confession obtained during the delay. *Mallory v. United States,* 354 U.S. 449 (1957); *McNabb v. United States,* 318 U.S. 332 (1943).

However, at the time, Waller was *not* under arrest and therefore no presentment issue arose. As detailed above, Waller was free to and in fact did leave the law enforcement office following each of the statements detailed above.

*The Statements Were Voluntary*

"The test for determining the voluntariness of a confession is whether the [government] extracted the confession by threats, violence, or direct or implied promises, such that the 'defendant's will [was] overborne and [her] capacity for self-determination critically impaired.' "

59

*United States v. Williams*, 720 F.3d 674, 691 (8th Cir. 2013) (quoting *United States v. Gannon,* 531 F.3d 657, 661 (8th Cir. 2008)). In making this determination, courts "consider the totality of the circumstances, including the conduct of the officers and the characteristics of the accused, in determining whether a suspect's waiver or statements were the product of an overborne will." *United States v. Daniels*, 775 F.3d 1001, 1004 (8th Cir. 2014) (citing *United States v. Havlik,* 710 F.3d 818, 822 (8th Cir. 2013)). "We consider, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id.* at 1004-05 (citing *Sheets v. Butera,* 389 F.3d 772, 779 (8th Cir. 2004)).

The evidence presented at the hearing will demonstrate that there was nothing about the length of the questioning or the conditions that was inherently coercive and Waller was not subjected to any mental, physical or psychological duress. Here, Waller was 40 years old and had finished a college education.  Waller was already well more familiar than the average person with his *Miranda* rights based on his previous employment as a law enforcement officer. Because of that experience, Waller was also conversant with law enforcement interview techniques, making it highly unlikely that he would be susceptible to having his will overborne. There is no indication that Waller was under the influence of alcohol or drugs.

Nothing about Waller's personal characteristics suggests that he was unduly impressionable to law enforcement questioning and SA Ritter's questions were not coercive or threatening, directly or indirectly. During the first interview, Waller was offered and accepted something to drink and was afforded various opportunities to use the restroom. At the culmination of the interview, Waller left and was not arrested at the end of either meeting. *See United States v. Carlson,* 613 F.3d 813, 817 (8th Cir. 2010) (citing *Griffin,* 922 F.2d at 1349).

Therefore, there is no basis to suppress these statements.

**October 12-13, 2011 Interview at Pemiscot County Jail**

Waller next seeks suppression of the statements he made on October 12, 2011 at the Pemiscot County Jail in Caruthersville, Missouri.  A defendant may knowingly and intelligently waive his rights and agree to answer questions. *Miranda v. Arizona,* 384 U.S. 436, 479 (1966). The prosecution need show by a preponderance of the evidence that a statement made by a defendant while in custody, was made after a voluntary, knowing, and intelligent waiver of *Miranda* rights by the defendant. *Colorado v. Connelly,* 479 U.S. 157, 168–69 (1986). The Court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine,* 475 U.S. 412, 423–24 (1986).

"A waiver is knowing if it is 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' (citation omitted) It is voluntary if it is 'the product of a free and deliberate choice rather than intimidation, coercion, or deception.' "*United States v. Syslo,* 303 F.3d 860, 865 (8th Cir. 2002) (quoting *Moran,* 475 U.S. at 421); *accord United States v. Turner,* 157 F.3d 552, 555 (8th Cir. 1998).

Here, Waller had full awareness of all of his *Miranda* rights and voluntarily signed a waiver acknowledging all of his rights. He waived those rights and voluntarily agreed to speak with SA Ritter. The evidence will show that the statements were not extracted by coercive means or derived via threats and/or promises of leniency of any kind.  Additionally, even if law enforcement had extolled the value of cooperating with authorities, no false representations were

made. *See United States v. Astello*, 241 F.3d 965, 967-68 (8th Cir. 2001) (holding that analogy about train leaving station and those who told the truth would be on the train not coercive); *United States v. Kilogre*, 58 F.3d 350, 353 (8th Cir. 1995) (noting defendant's incorrect belief that he had been promised leniency would not render confession involuntary); *United States v. Mashburn*, 406 F.3d 309-10 (4th Cir. 2005) (finding confession voluntary though agents told defendant he faced a 10-year sentence and the only way to reduce the sentence was to cooperate); *United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002) (noting that neither a promise of lenience, an expressed disbelief in defendant's statements, nor lies to the defendant about the evidence against him will necessarily render a confession involuntary); *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002) (finding statement voluntary though agent promised to make defendant's cooperation known to the prosecutor and judge).

Additionally, there is no basis to suppress the statement on prompt presentment grounds. Waller made his appearance before a United States Magistrate Judge after his arrest on federal charges. He had not yet been arrested on state murder charges and was not entitled to an appearance before a judge in state court at that time.

Waller's October 12, 2011 statement was voluntarily made after a knowing waiver of *Miranda* rights and therefore, any motion to suppress it is without merit.

### May 22, 2013 Statements During Search of Red Star Boat Ramp & Surrounding Area

Waller next asks the Court to suppress the statements he made to investigators on May 22, 2013.

Prior to this time, Waller had been advised of his *Miranda* rights on several occasions and waived those rights. As noted above was already familiar with those rights from his prior law enforcement experience. Additionally, Waller was represented by counsel on state murder

charges and had the benefit of his lawyers' advice. In an effort to avoid the first degree murder

charge (trial of which was looming) and a significantly higher sentence, Waller and his attorneys

negotiated with APA Angel Woodruff and offered that, in exchange for Waller providing

investigators information allowing for the recovery of Jacque Waller's body, Waller would be

permitted to plead to second degree murder and receive a sentence of 20 years' imprisonment.

While Waller's statements were made in an attempt to induce leniency from the state

prosecution, they were made upon advice of counsel and in no way coerced.

Waller voluntarily told investigators details to assist in their search for the burial site and

made various admissions about where he buried Jacque's body. This was not a situation where

investigators were interrogating Waller in any traditional sense of the word; instead, he was

providing information in his best interest on advice of counsel.

Waller made his statements without influence by threat, coercion, physical intimidation

or misrepresentation. Instead, he make the statements in his own best interest as a prerequisite of

Waller's effort to obtain a 20-year sentence.  The statements were voluntary and made at the

direction and with the blessing of his defense attorneys. Far from being coerced, they were made

not in response to interrogation, but voluntarily by Waller to attempt to assist investigators in

locating Jacque Waller's body, thus positioning himself better with the APA.

**June 3-4, 2013 Statements at FBI-Cape Girardeau**

Waller next seeks suppression of the statements made at the CGRA of the FBI on June 3,

2013.  The evidence will show that the circumstances leading to the statement on that date were

as follows:

Waller's attorney, Chris Davis and Cape Girardeau County Assistant Prosecuting

Attorney Angel Woodruff arranged a meeting.  Present at that meeting were Davis (who arrived

late), Woodruff and Waller's other defense attorney, Amy Comean. Waller was in custody at the time. The interview was audio and video recorded. The camera was turned off during breaks and to change out tapes.

At the beginning of the interview (approximately 10:21 a.m.), defense attorney Comean and APA Woodruff advised Waller of the details and terms of plea agreement resolving state murder charges against Waller. APA Woodruff specifically told Waller that the agreement did not and could not include any promise that he would not be prosecuted in federal court or the State of Illinois, and that his statements during the interview could be used against him. Waller sought clarification and asked, "or this?" and APA Woodruff answered, "for anything." Waller stated that he understood.  After consultation with defense attorney Comean, Waller stated he was ready to proceed.  At approximately 10:26 a.m., Waller was advised of his *Miranda* rights, and agreed to waive those rights and answer questions. Waller executed a Federal Bureau of Investigation Advice of Rights Form FD-395. This form details all relevant rights.

The evidence will show that Waller's counsel was present at all times and that at no time did investigators or APA Woodruff make any threats, promises, misrepresentations or physically intimidate Waller in any way in order to induce his waiver of *Miranda* rights.

Thereafter, Waller provided information to investigators about the crime. At approximately 12:22 p.m., there was a lunch break that lasted approximately one hour during which Waller's attorneys provided him food from Applebee's. The interview resumed at approximately 1:25 p.m. and continued until approximately 5:17 p.m.

First, the fact that Waller's defense counsel was present during the making of these statements demonstrates that they are not subject to suppression. The presence of counsel serves

64

as the "adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege [against self-incrimination]." *Miranda,* 384 U.S. at 466.

Second, Waller made the statements after a valid waiver of *Miranda* rights in the presence of his counsel.

Third, the statements were wholly voluntary.  There were no false promises made to induce the statements and Waller was fully and accurately informed by investigators and APA Woodruff of the consequences of making the statements.  Specifically, as part of his *Miranda* warnings, Waller was told that the statements he made could be used against him in Court. Additionally, APA Woodruff unambiguously informed Waller that his statements in the interview could be used against him "for anything," and that she could not speak to what the federal or Illinois authorities would do.

Finally, there was certainly nothing coercive about the environment in which the statements were made.  While Waller was in custody, he was in the presence of his attorneys. Additionally, he was given breaks during the interview and afforded the benefit of a lunch from Applebee's restaurant, a welcome departure from his typical jail food.

Under the totality of the circumstances, there is absolutely no evidence to support that Waller's rights were violated in connection with the giving of this interview and there is no basis to suppress the statements made during it.

### June 6, 2013 Statements During Plea/Sentencing Hearing

Finally, Waller seeks to suppress the statements he made in open court, under oath in the presence of his attorneys during his plea and sentencing hearing.

On June 6, 2013, Waller appeared in the 32nd Judicial Circuit Court in Cape Girardeau County before the Honorable Benjamin F. Lewis in Case No. 12CG-CR00686-01 to plead guilty

pursuant to a plea agreement to a second degree murder charge.   Waller appeared with his

attorneys Chris Davis, Amy Comean and Chris Heeb. APA Angel Woodruff represented the

state.  Waller was placed under oath (in the presence of his attorneys) and made various

statements to the Court. During the course of questioning from the Court, Waller stated the

following relevant to his motion to suppress:

- He graduated from high school, finished college, and has no problem reading, writing or understanding English (p. 3, 11)
- He had not consumed any drugs, medication, or alcohol in the last 40 hours (p. 3-4)
- He understood the charges and the right to plead not guilty and have a trial (p. 4)
- No one threatened him or anyone he cared about, or promised him anything other than what was in the plea agreement to get him to plead guilty, nor did anyone tell him anything to do with the case was a secret and not to tell the judge about it. (p. 4)
- He understood that APA Woodruff could not bind "any other authorities" including the State of Illinois and the federal government and that any charges he would face from those agencies would be completely separate and have nothing to do with the plea agreement. (p. 5)
- Waller's attorneys investigated the case and negotiated the plea to his satisfaction (p. 8-9)

Waller's voluntary statements made in open court are not subject to suppression. As

noted above, no *Miranda* warnings are required when defense counsel is present.  *See Miranda,*

384 U.S. at 466 ("The presence of counsel ... would be the adequate protective device necessary

to make the process of police interrogation conform to the dictates of the privilege [against self-

incrimination]."); *see also Edwards v. Arizona,* 451 U.S. 477, 485–86 (1981) ("The Fifth

Amendment right identified in *Miranda* is the right to have counsel present at any custodial

interrogation."); *Michigan v. Mosley,* 423 U.S. 96, 112–13, 116–17 (1975) ("*Miranda* held that

any confession obtained when not preceded by the required warnings or an adequate substitute

safeguard was per se inadmissible in evidence.... [L]anguage in *Miranda* suggests that the

presence of counsel is the only appropriate alternative"); *United States v. Guariglia,* 757 F.Supp.

259, 264 (S.D.N.Y.1991) ("[I]f *Miranda* warnings are meant to protect a defendant until he can

66

consult counsel, ... they are not necessary when counsel is present."); *Vos v. Turley*, 496 F. App'x 798, 802–03 (10th Cir. 2012).

Moreover, there was nothing coercive about the circumstances at the court proceeding that would render Waller's statements involuntary.  The court's colloquy with Waller and his answers listed above demonstrate that. Again, APA Woodruff outlined the agreement between the parties fairly and accurately. As such, these statements are not subject to suppression.

**Other Statements**

Waller made several statements to law enforcement officers in this case, all of which were voluntary and none of which are subject to suppression.  These statements are all detailed in discovery provided to defense counsel.

In his motion, Waller purports to move to suppress "all alleged statements" "which the Government intends to use as evidence against Defendant," [Doc. 58, p. 1] however, he specifically addresses only the aforementioned in his motion to dismiss.

This Court's May 24, 2016 order provides, "any motion to suppress shall set forth, with particularity, the item(s)of evidence to which the motion is addressed, and shall set forth specific factual details to support any claim that such evidence was unlawfully obtained. **Any motion to suppress not containing such specific information or any motion cast in conclusory or conjectural terms will not be heard or considered by the Court.**" [Doc. 12, p. 2].

In light of the clear language in the Court's order, Waller's motion should be limited to the statements specifically discussed in his motion.

**Suppression of Physical Evidence**

Waller argues that various evidence seized in this matter was "fruit of the poisonous tree," and thus subject to the Exclusionary Rule. [Doc. 58, p. 4]. Specifically, Waller contends

that evidence derived from coercive interrogation is subject to suppression.  Waller then lists various evidence that he claims are fruits of involuntary statements.

The exclusionary rule prohibits the admission of evidence unconstitutionally obtained. *Weeks v. United States*, 232 U.S. 383 (1914). The rule also applies to evidence, tangible and testimonial, which was derived, directly or indirectly, from the unconstitutionally obtained evidence, *i.e.*, the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487 (1963); *Nardone v. United States*, 308 U.S. 338 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920).

As a preliminary matter, for the reasons stated above, there is no basis whatsoever to conclude that any of Waller's statements to law enforcement are subject to the exclusionary rule for any reason. As such, there is no poisonous tree, and thus no tainted fruit. Accordingly, Waller's motion to suppress physical evidence must be rejected in its entirety.

Waller's reliance on any purported *Miranda* violation to support his argument to suppress evidence as "fruit of the poisonous tree" is without legal basis.  First, as established above, some of Waller's statements were made when he was not in custody and therefore, no *Miranda* warnings were required.  Second, any custodial interrogation that did take place occurred after Waller was fully advised of and voluntarily waived his *Miranda* rights.  Third, the Supreme Court has expressly rejected the application of the exclusionary rule to evidence derived from voluntary, unwarned statements. *See United States v. Patane*, 542 U.S. 630, 643 (2004).  The Eighth Circuit has also acknowledged this principle in *United States v. Villa-Gonzalez*, 623 F.3d 526, 535 (8th Cir. 2010) (citing *Patane* and recognizing that "the lack of a *Miranda* warning does not justify the suppression of the physical evidence seized pursuant to a search warrant derived from a voluntary un-warned statement.").

68

Thus, Waller's only viable legal basis for seeking suppression of evidence derived from his statements is to demonstrate that the statements were involuntary. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Vega,* 676 F.3d 708, 718 (8th Cir. 2012) (citation and internal quotation marks omitted). "The court consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id.* (alteration in original) (citation and internal quotation marks omitted).

As demonstrated above, and as will be shown through testimony at the hearing in this matter, law enforcement did not subject Waller to any mental, physical or psychological duress as Waller alleges in his motion.  Nor was there anything about his interrogation that was coercive. On the contrary, Waller was an adult with a college education. Additionally, Waller had a sophisticated understanding of his rights based on having been a member of law enforcement himself. No promises, threats or misrepresentations were made to induce statements from him.

Viewing the totality of the circumstances, Waller's statements were completely voluntary and therefore any evidence derived therefrom is in no way subject to suppression under the fruit of the poisonous tree or any other doctrine. Accordingly, Waller's motion to suppress physical evidence must be denied.

**6.    Motion for Production of Memoranda Relating to Interviews With Witnesses and to Require Government Agents to Preserve Their Rough Notes**

Defendant has moved that government investigators be ordered to disclose any rough notes developed during the investigation.  Under present law, the Government is not required even to preserve such notes.  *United States v. Leisure*, 844 F.2d 1347, 1360-61 (8th Cir. 1988); *United States v. Kuykendall*, 633 F.2d 118, 119-20 (8th Cir. 1980); *cf. Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  However, the Eighth Circuit has indicated that the better practice is to preserve rough notes in case a future need for them arises.  *Leisure*, 844 F.2d at 1360-61 n.10. The Government opposes any motion to produce those notes.  The Government is aware of its duty to produce material subject to the rule in *Brady v. Maryland* and its progeny.  The Government will also produce any rough notes which were signed or adopted by a witness in the Government's case in chief and any recorded statements of the witness, pursuant to the Jencks Act.  *United States v. Shyres*, 898 F.2d 647, 657 (8th Cir. 1990).  The Government is under no duty to produce agents' rough notes or "statements" that fall outside these two areas, however. Fed. R. Crim. P. 16(a)(2); *United States v. Williams*, 962 F.2d 1218, 1224-25 (6th Cir.), *cert. denied*, 113 S. Ct. 264 (1992); *United States v. Pisello*, 877 F.2d 762, 767-68 (9th Cir. 1989); *United States v. Dekle*, 768 F.2d 1257, 1263 (11th Cir. 1985); *Kuykendall*, 633 F.2d at 119-20; *United States v. Burger*, 773 F.Supp. 1419, 1425 (D. Kan. 1991).

**7.     Motion for Early Jencks Material**

Defendant moves for an order for "Early Jenks Material" but cites no case law permitting the Court to enter such an order.  This is for good reason, as this Court is without authority to order disclosure of Jencks Act materials earlier than provided in the Act.  *United States v. Tucker*, 2007 WL 7714938 at 2 (E.D.Mo., Dec. 11, 2009), *citing United States v. White*, 750 F.2d 726, 729 (8th Cir 1984).

70

To the extent Waller's motion calls for the Government to both preserve and provide impeaching or exculpatory materials under *Brady* or *Giglio*, the Government certainly will do so, as addressed in Waller's motion specifically calling for disclosure of impeaching or exculpatory materials.  To the extent Waller, again without citation to authority, seeks a court order directing the Government to preserve any communication from any Government witness to a government agent, such request is beyond the scope of discovery as set forth more particularly in the Government's General Objection to Scope of Defendant's Discovery Request herein.

The Government agrees to provide pretrial disclosure of all Jencks material that is discoverable under the provisions of Title 18, United States Code, Section 3500.  This disclosure will be made no later than the Friday before trial, in accordance with the custom and practice of this district.  This concession on the part of the Government is predicated upon a similar concession from the defendant with the Government's motion for production of statements of witnesses previously filed.

**8.**     **Motion for Disclosure Pursuant to Rules 404(b) and 609 Fed.R.Evid.**

The Government will comply with the dictates of Rule 404(b) regarding the appropriate disclosure of such evidence should the Government determine that it will offer evidence under Rule 404(b).

**9.**     **Motion to Disclose Contact Between Government Agents or Prosecutors And Potential Jailhouse Informants Incarcerated With Defendant**

The defendant's motion exceeds the scope of Rule 16, *Brady v. Maryland* and the Jencks Act.  The Government objects to the requests contained in defendant's motion not specifically provided for in Rule 16, *Brady v. Maryland*, or the Jencks Act, as being beyond the scope

71

required by *Brady*; 18 U.S.C. § 2510-20; 18 U.S.C. § 3504; and Rules 12(d)(2), 16, and 41 of the Federal Rules of Criminal Procedure.

**10.      Motion for Disclosure of Favorable, Exculpatory, and Impeaching Information**

The Government is aware of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963); and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and will comply therewith.

**General Objection to Scope of Defendant's Discovery Request.**

There is no general constitutional right to discovery in a criminal case.  *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375 (1985); *United States v. Grier*, 866 F.2d 908, 917 (7th Cir. 1989).  In most criminal prosecutions, Rule 16, the rule of *Brady v. Maryland*, and the Jencks Act exhaust the scope of discovery to which a defendant is entitled.  *United States v. Presser*, 844 F.2d 1275, 1286 n. 12 (6th Cir. 1988).

The defendant's various motions for discovery and production exceed the scope of Rule 16, *Brady v. Maryland* and the Jencks Act.  The Government objects to each and every request contained in defendant's motions not specifically provided for in Rule 16, *Brady v. Maryland*, or the Jencks Act, as being beyond the scope of information to which the defendant is entitled under *Brady*; 18 U.S.C. § 2510-20; 18 U.S.C. § 3504; and Rules 12(d)(2), 16, and 41 of the Federal Rules of Criminal Procedure.

<u>**Conclusion**</u>

For all of the foregoing reasons, Waller's motions are without merit and should be denied.

                              CARRIE COSTANTIN
                              ACTING UNITED STATES ATTORNEY

/s/ Larry H. Ferrell
LARRY H. FERRELL, #28874MO
ASSISTANT UNITED STATES ATTORNEY
555 Independence, 3rd Floor
Cape Girardeau, MO 63703
(573) 334-3736

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2017, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

John M. Lynch
Attorney for Defendant

/s/ Larry H. Ferrell
Larry H. Ferrell
Assistant United States Attorney